**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICHARD CLAIRMONT,
    *Plaintiff-Appellant,*

   v.

SOUND MENTAL HEALTH,
     *Defendant,*

   and

JONI WILSON, in her individual
capacity,
    *Defendant-Appellee.*

No. 09-35856

D.C. No.
2:08-cv-00507-TSZ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, Senior District Judge, Presiding

Argued and Submitted
July 16, 2010—Seattle, Washington

Filed January 19, 2011

Before: Susan P. Graber and Richard A. Paez,
Circuit Judges, and Larry A. Burns,* District Judge.

Opinion by Judge Paez

---

*The Honorable Larry A. Burns, United States District Judge for the
Southern District of California, sitting by designation.

## COUNSEL

Jesse A. Wing, MacDonald Hoague & Bayless, Seattle, Washington, for the plaintiff-appellant.

Erin L. Overbey, Assistant City Attorney, Seattle, Washington, for the defendant-appellee.

## OPINION

PAEZ, Circuit Judge:

In this First Amendment retaliation case, Richard Clairmont appeals the district court's grant of summary judgment to Defendant Joni Wilson, the Manager of Probation Services at the Seattle Municipal Court. Before filing suit, Clairmont was employed as a domestic violence counselor for Sound Mental Health, a private company that provides domestic violence prevention treatment programs to criminal defendants in Seattle. He alleges that he was fired in retaliation for giving truthful subpoenaed testimony in a criminal proceeding. Although Clairmont was not employed directly by the Seattle Municipal Court, the district court determined that, because his employer was an independent contractor for the court, his First Amendment claim should be evaluated as if he were a public employee. Applying the *Pickering*[1] public employee balancing test, the district court determined that the Seattle Municipal Court's interests outweighed Clairmont's First Amendment interests, and granted Wilson's motion for summary judgment on the basis of qualified immunity.

As we explain below, we agree with the district court that, for the purposes of this suit, Clairmont's retaliation claim should be evaluated as if he were a public employee. We conclude, however, that Clairmont's First Amendment interests outweigh the administrative interests of the Seattle Municipal Court and that his rights were clearly established at the time of the alleged violation. We therefore reverse and remand.

---

[1]*Pickering v. Bd. of Educ.*, 391 U.S. 568 (1968).

## I.  Background

Sound Mental Health ("SMH") is a private company that is regulated and certified by the Washington Department of Social and Health Services to provide domestic violence perpetrator treatment ("Treatment") to defendants charged with or convicted of domestic violence offenses. *Id.* Clairmont was employed by SMH from December 2005 to late November 2007 as a "Program Manager." In this position, Clairmont was responsible for coordinating and supervising SMH's Treatment program.

Certified Treatment providers are placed on a list that the Domestic Violence Probation Unit ("Probation Unit") of the Seattle Municipal Court ("Municipal Court") distributes to pretrial and convicted defendants who must complete a Treatment program.[2] The staff in the Probation Unit do not make referrals to specific providers, but they do inform potential participants whether a provider has special services that might be of interest to a defendant. Defendants choose which Treatment program they want to attend and pay the provider directly; the Municipal Court is not involved in the monetary transaction between a defendant and a Treatment provider.

Unlike other Treatment providers on the list, SMH had a contract with the Municipal Court during the time in question. Under the terms of the contract, SMH provided specified services to the general public and to Treatment participants. In return for its services, the Municipal Court provided SMH with equipment and office space at the courthouse; there were no direct payments between the parties. In addition, SMH agreed to submit monthly reports and to attend meetings with

---

[2]The court may defer prosecution of defendants accused of a domestic violence offense under a stipulated order of continuance, provided that the defendant voluntarily completes a Treatment program and complies with other court-ordered conditions. Wash. Rev. Code § 26.50.150; Wash. Admin. Code § 388-60.

the Municipal Court probation staff as needed. The contract specifically characterized SMH as an "independent contractor."

On November 8, 2007, Clairmont was subpoenaed to testify as an expert witness in a hearing on behalf of a criminal defendant who was enrolled in a Treatment program with a different organization. The Treatment organization had terminated the pre-trial criminal defendant from the program prematurely, and the Probation Unit accordingly sought to revoke the continuance of his prosecution and to impose jail time and other sanctions. The defendant's counsel believed that her client had been treated differently because of his status as a Spanish-speaking defendant and informally consulted with Clairmont before the hearing about the reasons that the Treatment provider had given for the termination. The defendant's counsel later subpoenaed Clairmont to testify at the revocation hearing. At the hearing, Clairmont qualified as an expert witness and the parties posed hypothetical questions to him concerning when it might be appropriate to terminate a participant from a Treatment program.

A Probation Unit staff member heard Clairmont's testimony and brought it to the attention of her supervisor, Joni Wilson, Manager of Probation Services for the Municipal Court. On November 14, 2007, Wilson contacted Clairmont's supervisor at SMH regarding Clairmont's testimony and, on November 29, 2007, Clairmont was fired. The letter informing Clairmont of his termination stated, in pertinent part:

> Sound Mental Health has very recently received further critical feedback from the City of Seattle Domestic Violence Probation Officers Unit about your performance and program management. Your advocacy for clients remains strong. However, prior attempts to improve accountability, care coordination and [to] restore confidence in your management of the program with the probation unit have been

unsuccessful. The unit reports that they have lost trust in the integrity of the program and consider that the situation is not salvageable. The program is in jeopardy. They have proposed a stop-referral beginning immediately. This leaves SMH with no option but to terminate your employment effective today . . . .

In April 2008, Clairmont filed suit against SMH and Wilson under 42 U.S.C. § 1983, alleging that he was terminated by SMH in violation of his First Amendment right to free speech and asserting various state-law claims against SMH.[3] Wilson filed a motion for summary judgment asserting that she was entitled to qualified immunity. She argued that, in light of the factual record, Clairmont had failed to establish a violation of his First Amendment free speech rights and, even if he had, the law was not clearly established when Clairmont was fired. Wilson also argued that Clairmont was fired, not because of his testimony, but because of his poor performance as a program manager.

The district court, analyzing the facts as if Clairmont were a public employee, concluded that Clairmont's testimony was not protected speech, both because it was not on a matter of public concern and because Clairmont's speech was of such "minimal value" that it was outweighed by the Probation Unit's interests in addressing victim safety and civil liability. The district court held, in the alternative, that "Clairmont's First Amendment right was not so 'clearly established' as to preclude qualified immunity for Ms. Wilson." Clairmont timely appealed.[4]

---

[3]Clairmont settled his claims against SMH, which resulted in dismissal of his suit against SMH.

[4]We review de novo a grant of summary judgment on the basis of qualified immunity. *Elder v. Holloway*, 510 U.S. 510, 516 (1994). In determining whether summary judgment was appropriate, we must view the evidence in the light most favorable to the non-moving party. *Huppert v. City of Pittsburgh*, 574 F.3d 696, 701 (9th Cir. 2009).

## II.   Discussion

As a preliminary matter, Wilson argues that she could not have violated Clairmont's First Amendment rights because she did not have any governmental authority over him. More specifically, Wilson argues that she lacked the authority to fire Clairmont or to order the Probation Unit to stop referring clients to SMH. Regardless of Wilson's actual authority, the factual record could reasonably support a finding that Wilson threatened SMH with the possibility that the Probation Unit would stop referring defendants to SMH unless SMH terminated Clairmont. In addition, First Amendment protection does not depend on whether the governmental action is direct or indirect. Where the government may not prohibit certain speech, it also may not threaten to exert economic pressure on a private employer in order to " 'produce a result which [it] could not command directly.' " *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (alteration in orginal) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)).

In reviewing the district court's legal conclusion that Wilson is entitled to qualified immunity, we apply the familiar analytical framework laid out in *Saucier v. Katz*, 533 U.S. 194 (2001), *modified by Pearson v. Callahan*, 129 S. Ct. 808 (2009). Under *Saucier*, whether a government official is entitled to qualified immunity is a two-part inquiry: (1) whether the facts alleged, taken in the light most favorable to the party

---

Clairmont also challenges (1) the denial of his motion to strike certain deposition testimony, and (2) the grant of Wilson's motion to amend her answer. First, in light of our conclusion that Wilson is not entitled to qualified immunity, we hold that the denial of Clairmont's motion to strike is moot. We therefore dismiss Clairmont's appeal of this issue. Second, because Clairmont cannot establish that he was prejudiced, we reject Clairmont's challenge to the order granting leave to amend. *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001). Accordingly, we affirm the district court's ruling granting Wilson's motion to amend.

asserting the injury, show that the official's conduct violated a constitutional right; and (2) whether that right was clearly established "in light of the specific context of the case." *Id.* at 201. We address these questions in turn. *See Pearson*, 129 S. Ct. at 818 (holding that courts may consider the two prongs in either order).

## A. The public employee balancing test applies

**[1]** Before addressing whether Clairmont has demonstrated that Wilson violated his constitutional rights, we must first determine whether Clairmont should be considered a public employee or a private citizen. "[T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering*, 391 U.S. at 568. This is because the government, as an employer, has an interest "in promoting the efficiency of the public services it performs through its employees." *Id.* As a result, "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) (per curiam).

When a plaintiff is a public employee, we apply a test that balances the government's legitimate administrative interests as an employer against the employee's interests in free speech, to determine whether the government has violated the employee's First Amendment right to speak freely. *See id.* Accordingly, in evaluating whether a plaintiff should be considered a public employee, we consider whether the relationship between the parties is analogous to that between an employer and employee and whether the rationale for balancing the government's interests in efficient performance of public services against public employees' speech rights applies. *CarePartners, LLC v. Lashway*, 545 F.3d 867, 881 (9th Cir. 2008) (citing *Blackburn v. City of Marshall*, 42 F.3d

925, 932-34 (5th Cir. 1995)), *cert. denied*, 129 S. Ct. 2382 (2009).

**[2]** An independent contractor who provides services to the government is generally treated like a public employee for purposes of determining whether the contractor has alleged a violation of his First Amendment rights. *Bd. of Cnty. Comm'rs. v. Umbehr*, 518 U.S. 668, 673-74 (1996). In *Umbehr*, the Court noted the similarities between an independent contractor and a public employee, recognizing both an independent contractor's interests in financially valuable government contract work and the government's need to be free to terminate an independent contractor (1) to respond to poor performance; (2) to improve efficiency, efficacy, and responsiveness; and (3) to prevent the appearance of corruption. *Id.* at 674. Recognizing that independent contractors are protected by the First Amendment from retaliatory government action, the Court held that "the *Pickering* test, determines the extent of their protection." *Id.* at 673. Thus, "[w]hen a business vendor operates under a contract with a public agency, we analyze its First Amendment retaliation claim under § 1983 using the same basic approach that we would use if the claim had been raised by an employee of the agency." *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 923 (9th Cir. 2004).

Clairmont was not employed by the Municipal Court; he worked for SMH, a private company. Therefore, it is not immediately obvious whether he should be treated as a public employee, an independent contractor, or as a private citizen. Clairmont argues that, because he was not employed by the Municipal Court, he should be treated as a private citizen. As Clairmont notes, although the Probation Unit relies on the information it receives from Treatment providers, it provides no direct funding to these organizations, nor does it have control over the certification, programming, hiring, or firing by the various Treatment providers. There is also no evidence in the record that there was any obligation or even authorization

for Wilson to threaten SMH that the Probation Unit would stop making referrals if management did not make the changes that she wanted, such as removing Clairmont from his position.[5] As Clairmont points out, under the applicable regulation, the authority to investigate complaints against Treatment providers and to impose sanctions rests with the Department of Social and Health Services, not the Probation Unit. Wash. Admin. Code § 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. Thus, under this regulation, if Wilson had concerns about SMH's Treatment program, she could have contacted the Department of Social and Health Services officials and asked them to conduct an investigation.

Clairmont argues that SMH, like other Treatment providers, is simply a licensee that is regulated by the state. This argument might have some force were it not for the unique relationship between the Municipal Court and SMH. Although SMH was licensed by the state as a Treatment provider, and listed as a provider of such services, it offered its services at the courthouse and maintained a close relationship with representatives from the Probation Unit. Under the terms of its contract with the Municipal Court, SMH "provide[d] screening and referral case management and consultation to the Probation Unit." SMH was also required to provide "staff coverage in the court Resource Center 40 hours per week." Further, "[a]ll SMH staff [had to] submit a monthly report . . . to document the number of participant's [sic] served, direct

---

[5]Wilson argues that she had an obligation to contact SMH when she became concerned about Clairmont's testimony. She relies on the Washington Supreme Court's opinion in *Hertog v. City of Seattle*, 979 P.2d 400 (Wash. 1999) (en banc), which held that probation counselors have a duty to protect the public from reasonably foreseeable danger resulting from the dangerous propensities of probationers under their supervision. Wilson's reliance on *Hertog* is misplaced; the fact that Wilson might be obligated to monitor carefully the defendants under the Probation Unit's supervision does not turn the Probation Unit's relationship with all of the defendants' service-providers into an employer-employee relationship for purposes of First Amendment analysis.

services rendered, number of service hours, and linkages to other court and community based services." The contract further provided that SMH's work "shall, at all times, be subject to the City's [through the Municipal Court] general review and approval." Finally, as noted above, the contract characterized the relationship between SMH and the Municipal Court as "that of an independent contractor."

**[3]** Clairmont was not a signatory to the contract, but SMH could not provide Treatment services without certified individual providers like Clairmont. Although Clairmont was not a Municipal Court employee, given the nature of the relationship between the court and SMH, the nature of the services provided by SMH, and Clairmont's role in the provision of such services, we conclude that his relationship to the Municipal Court was analogous to that of an employer and employee. Further, given the Probation Unit's need to ensure that SMH's services were properly provided to court-ordered Treatment participants, the balance tips in favor of treating Clairmont as a public employee for purposes of determining whether he has alleged a viable First Amendment retaliation claim. We therefore review Clairmont's First Amendment retaliation claim using the *Pickering* balancing test set forth below.

### B. Under the public employee balancing test, Clairmont has alleged a First Amendment retaliation claim

**[4]** "It is well settled that the state may not abuse its position as employer to stifle 'the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest.' " *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (quoting *Pickering*, 391 U.S. at 568), *cert. denied*, 130 S. Ct. 1047 (2010). In applying *Pickering's* balancing test, we employ a sequential five-step inquiry to determine whether a public employee has alleged a violation

of his First Amendment rights as a result of government retaliation for his speech:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Id.* The plaintiff bears the burden of proof on the first three areas of inquiry, but the burden shifts to the government to prove the last two. *Id.* at 1071. If the plaintiff fails to carry his burden at any step, qualified immunity should be granted to the defendant. *Id.* at 1070-72. Here, because Clairmont ultimately prevails at all five steps, we conclude that he has alleged sufficient facts to establish that he was terminated in violation of his First Amendment rights.

### 1. Clairmont's speech was on a matter of public concern

"We have defined the scope of the public concern element broadly and adopted a liberal construction of what an issue of public concern is under the First Amendment." *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709-10 (9th Cir. 2009) (internal quotation marks and citations omitted). We have specifically rejected "rigid multi-part tests" and refused to "articulate[ ] a precise definition of public concern." *Id.* at 709 (internal quotation marks omitted). Rather, we rely on the framework set forth in *Connick v. Myers*, which reviews "the *content, form, and context* of a given statement, as revealed by the whole record." 461 U.S. 138, 147-48 (1983) (emphasis added); *Eng*, 552 F.3d at 1070. On the basis of this "general-

ized analysis of the nature of the speech," we can place the speech on a continuum ranging from matters of public concern to matters of purely personal concern. *See Desrochers*, 572 F.3d at 709. On one end, there is speech that relates to matters of concern to the community, including political or social matters. *Eng*, 552 F.3d at 1070. On the other end, there are individual grievances and personnel disputes that are irrelevant to the public's evaluation of governmental agencies. *Id.*

Clairmont argues that, regardless of the subject matter, truthful testimony given pursuant to a subpoena should be considered per se a matter of public concern. As we detailed in *Alpha Energy Savers,* our sister circuits are split on "whether the context of a courtroom appearance raises a public employee witness's testimony to the level of public concern, regardless of its content." 381 F.3d at 926 n.6. There, we declined to decide whether a public employee's testimony was inherently a matter of public concern. *Id.*

So too here, we need not decide whether truthful testimony given pursuant to a subpoena is per se a matter of public concern because in this case, the content, form, and context of Clairmont's testimony establish that his speech related to a matter of public concern.

"First and foremost, we consider the content of the speech the greatest single factor in the *Connick* inquiry." *Desrochers*, 572 F.3d at 710 (internal quotation marks and citation omitted). Speech that deals with the functioning of government is a " 'matter[ ] of inherent public concern.' " *Eng*, 552 F.3d at 1072 (quoting *Johnson v. Multnomah County,* 48 F.3d 420, 425 (9th Cir. 1995)). In addition, speech that helps the public evaluate the performance of public agencies addresses a matter of public concern. *Id.* at 1073 (citing *Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006)). Thus, for example, speech alleging that the government engaged in discrimination or other civil rights violations is on a matter of public concern. *See, e.g.*, *Alpha Energy Savers,* 381 F.3d at 925. Finally,

speech discussing "threats to public safety" is "of vital interest to citizens," and speech exposing policies that put people in jeopardy is " 'inherently of interest to the public.' " *Hyland v. Wonder*, 972 F.2d 1129, 1137 (9th Cir. 1992) (quoting *Roth v. Veteran's Admin.*, 856 F.2d 1401, 1406 (9th Cir. 1988)).

**[5]** Here, Clairmont's testimony dealt with the performance of an independent Treatment provider who had been treating a criminal defendant as part of a court-ordered program. Clairmont gave expert testimony regarding how he would have dealt with a hypothetical Treatment client who had engaged in the type of conduct the defendant allegedly committed. Clairmont's testimony thus dealt with the ways in which Treatment programs treat charged and convicted domestic violence offenders, which ultimately implicates the Municipal Court's attempts through the Probation Unit to protect victims of domestic violence—unquestionably a matter of public concern. *See Hyland*, 972 F.2d at 1137; *cf. Jones v. Union County,* 296 F.3d 417, 426 (6th Cir. 2002) (stating that "[T]here is no question that combating domestic violence is a matter of public concern"); *Rendish v. City of Tacoma*, 123 F.3d 1216, 1224 (9th Cir. 1997) ("A municipal court judge's allegedly inappropriate remarks made in domestic violence cases implicate the public's interest in the impartial administration of the courts.").

Moreover, it is irrelevant to our analysis whether Clairmont's testimony influenced the judge's ultimate determination regarding revocation. *Robinson v. York*, 566 F.3d 817, 823 (9th Cir. 2009), *cert. denied*, 130 S. Ct. 1047 (2010). Testimony that addresses a matter of public concern need not have an effect on the result of the litigation, it need only contribute in some way to the resolution of a proceeding in which a matter of public concern is at issue. *Id.*

**[6]** The form that the speech in question takes is another factor relevant to whether speech addressed a matter of public concern. *Desrochers*, 572 F.3d at 714-15, 715 n.17. Although

not dispositive, a small or limited audience " 'weigh[s] against [a] claim of protected speech.' " *Desrochers*, 572 F.3d at 714 (alteration in original) (quoting *Roe v. City of San Francisco*, 109 F.3d 578, 585 (9th Cir. 1997)); *see also Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006). For example, when speech takes the form of an internal employee grievance, and is not presented to the public, the form "cuts against a finding of public concern." *Desrochers*, 572 F.3d at 715. Here, the form of Clairmont's speech was subpoenaed testimony, which was presented in a public courtroom. Thus, the form of Clairmont's speech supports a determination that the speech was on a matter of public concern.

Finally, we consider the context of Clairmont's testimony and examine the point of his speech. *Id.* When a public employee's contested speech occurs in the context of an internal power struggle or personal employment grievance, this will militate against a finding of public concern. *Id.* Sworn courtroom testimony, however, will constitute speech on a matter of public concern when it "bring[s] to light potential or actual discrimination, corruption, or other wrongful conduct by government agencies or officials." *Alpha Energy Savers,* 381 F.3d at 925 (citing *Lytle v. Wondrash*, 182 F.3d 1083, 1087-88 (9th Cir. 1999); *Rendish*, 123 F.3d at 1223-24). Indeed, in *Alpha Energy Savers*, we held that a public employee's testimony on behalf of a co-worker's private grievance against his union was on a matter of public concern when he alleged that the union breached its duty of fair representation by failing to investigate and pursue a grievance against the county for employment discrimination on the basis of race and age. *Id*. We concluded that, irrespective of the motivation behind the speech in question, "[s]o long as either the public employee's testimony or the underlying lawsuit meets the public concern test, the employee may, in accord with *Connick*, be afforded constitutional protection against any retaliation that results." *Alpha Energy Savers,* 381 F.3d at 927.

**[7]** Here, the speech at issue was Clairmont's expert testimony at a criminal defendant's revocation hearing. His testimony was offered to help the judge decide whether to allow the defendant to continue his Treatment. Moreover, Clairmont spoke not because he volunteered to do so, but because he was subpoenaed. There is no record evidence that Clairmont was motivated by anything other than a desire to comply with the subpoena and to testify truthfully as required by law.

In sum, we conclude that the content, form, and context of Clairmont's testimony demonstrate that his speech was on a matter of public concern. We thus proceed to step two.

### 2. *Clairmont's testimony was not part of his official duties*

**[8]** A public employee's speech is not protected by the First Amendment when it is part of the employee's official job duties. *Garcetti*, 547 U.S. at 426. Whether an employee's disputed speech is part of his official duties presents a mixed question of fact and law. *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008). For purposes of considering Wilson's claim to qualified immunity at the summary judgment stage, we resolve any material factual disputes in Clairmont's favor. *Huppert v. City of Pittsburg*, 574 F.3d 696, 701 (9th Cir. 2009).

Here, SMH did not ask Clairmont to testify; he testified because he was subpoenaed by a third party. Moreover, the only evidence in the record regarding Clairmont's official job duties is Clairmont's "Job Description" attached to Wilson's motion for summary judgment.[6] Clairmont's job description did not include testifying as an expert witness in court proceedings. Indeed, there is nothing in the job description about testifying at all, even on behalf of his own clients.

---

[6]At his deposition, Clairmont reviewed the job description and verified that it "generally describe[d]" his job duties at SMH.

Wilson argues that it is not unusual for a domestic violence counselor to testify at a court hearing and supports her argument by referring to another domestic violence counselor who testified at the same hearing as Clairmont. As Clairmont points out, the fact that *other* domestic violence counselors from different organizations might testify at court hearings is irrelevant to whether *his* official job duties required him to testify at such hearings. In addition, the other counselor stated that he testified only because he was ordered to do so by the judge. Finally, Wilson admits in her summary judgment declaration that "[the probation unit counselor] found it unusual that Clairmont was testifying in [a] hearing that did not involve a person he was treating."

Wilson also argues that Clairmont nonetheless testified as part of his official duties because the content of Clairmont's testimony regarding his treatment philosophy described the nature of his duties as a contract counselor for SMH. In *Garcetti*, however, the Supreme Court held that even if the content of an employee's speech concerned the subject matter of his employment, this fact was not dispositive of the employee's First Amendment retaliation claim. 547 U.S. at 421. "As the Court noted in *Pickering*: 'Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.' " *Id.* (quoting *Pickering*, 391 U.S. at 572); *see also Eng*, 552 F.3d at 1073 (holding that Eng's version of the facts plausibly showed that he spoke as a private citizen because, although he learned about the subject matter of his speech in the course of his work, he had no official duty to complain about it to the relevant agency); *cf. Huppert*, 574 F.3d at 707-08 (granting qualified immunity because testifying in court is part of a California police officer's official duties).

[9] Although Clairmont testified about treating a hypothetical Treatment client, there is no evidence that testifying in

court, whether or not as an expert, was a part of his official duties at SMH. When viewed in the light most favorable to Clairmont, *Huppert*, 574 F.3d at 701, the record evidence supports a finding that Clairmont was not testifying as part of his official duties. We therefore continue to step three of the analysis.

### 3.   *Clairmont's testimony was a substantial or motivating factor in his termination*

**[10]** The third inquiry—whether Clairmont's testimony was a substantial or motivating factor in his termination—"is purely a question of fact. . . . [W]e must assume the truth of the plaintiff 's allegations." *Eng*, 552 F.3d at 1071. The parties dispute whether Clairmont was fired as a result of Wilson's comments to Clairmont's SMH supervisors about his testimony, or whether his termination resulted from complaints about Clairmont's performance made by Wilson long before Clairmont testified. Several emails in the record that, viewed in the light most favorable to Clairmont, *Huppert*, 574 F.3d at 701, reasonably could support a finding that Clairmont was fired because of Wilson's comments to his supervisor about Clairmont's subpoenaed testimony. We therefore proceed to step four.

### 4.   *Wilson failed to give an adequate justification for treating Clairmont differently than other members of the general public*

The government bears the burden of showing that under the *Pickering* balancing test, "the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418. "Although the *Pickering* balancing inquiry is ultimately a legal question, like the private citizen inquiry, its resolution often entails underlying factual disputes." *Eng,* 552 F.3d at 1071. As we have emphasized, we must view all dis-

puted facts in the light most favorable to Clairmont. *Huppert*, 574 F.3d at 701.

**[11]** *Eng* holds specifically that the government must establish that its "legitimate *administrative* interests outweigh the employee's First Amendment rights." *Id.* (emphasis added). These interests include promoting efficiency and integrity in the discharge of official duties and maintaining proper discipline in the public service. *Connick*, 461 U.S. at 150-51. Because Clairmont's speech is examined in the context of independent contractors, this test is "adjusted to weigh the government's interests as contractor rather than as employer." *Umbehr*, 518 U.S. at 673. Cases that analyze whether the government's administrative interests outweighed the plaintiff's right to engage in protected speech examine disruption resulting both from the act of speaking and from the content of the speech. Here, we conclude that Wilson has not established disruption of either kind sufficient to outweigh Clairmont's First Amendment rights.

In examining whether a public employee's act of speaking disrupted the workplace, we review "the manner, time, and place in which" the employee's speech took place. *Connick*, 461 U.S. at 152. In *Connick*, the fact that the employee's speech took place at the office supported the Court's determination that the speech disrupted the efficiency of the workplace. *Id.* at 153. The Court contrasted the situation with that in *Pickering*, where the employee's speech occurred during the employee's free time away from the office. *Id.* Here, Clairmont did not speak at the workplace during a Treatment session or at an office meeting; rather, he testified in a criminal hearing concerning a person he was not treating.

Relatedly, we consider whether Clairmont's testimony impeded his ability to perform his job duties. *See id.* at 151. Perhaps because Wilson earlier argued that testifying was one of Clairmont's official job responsibilities, Wilson makes no argument and puts forth no evidence that Clairmont's act of

testifying at the revocation hearing prevented him from fulfilling his other work responsibilities.

Wilson does argue, however, that the *content* of Clairmont's testimony interfered with the working relationship between SMH and the Probation Unit. In *Connick*, the Court held that "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Id*. at 151-52. There, the Court characterized the public employee's speech as "causing a mini-insurrection" and as "an act of insubordination which interfered with working relationships." *Id*. at 151. To prove that an employee's speech interfered with working relationships, the government must demonstrate "actual, material and substantial disruption, or reasonable predictions of disruption in the workplace." *Robinson*, 566 F.3d at 824 (internal quotation marks omitted). And if there are material factual disputes, we resolve all factual disputes in favor of the non-moving party, provided that there is evidence that reasonably would support such a finding. *See CarePartners*, 545 F.3d at 875 n.3 (citing *Scott v. Harris*, 550 U.S. 372, 379-80 (2007)).

**[12]** Here, although Wilson alleges that Clairmont's testimony disrupted the Probation Unit's workplace, she cites no record evidence to support the allegation. We note, however, that in support of her motion for summary judgment, Wilson filed a declaration in which she stated that the Probation Unit's staff aired some concerns about the content of Clairmont's testimony at the monthly staff meeting held the day after Clairmont testified. In speaking to Clairmont's supervisor, Wilson characterized her staff as distrustful of Clairmont because "[his] testimony indicated that [he] was still having the same problems I had discussed with [him earlier]." In other words, Wilson appears to argue that Clairmont's testimony was disruptive, because it confirmed his Treatment philosophy, which was the basis for his alleged performance issues.

We must construe all evidence in the light most favorable to Clairmont. *Huppert*, 574 F.3d at 701. As noted above, Clairmont produced evidence that disputes Wilson's allegations of prior poor performance. In addition, Clairmont argues that the Probation Unit's expressed distrust is a result not of what he said (or any alleged prior poor performance), but rather is a result of the fact that he testified on behalf of a criminal defendant and thus on the opposite side of the Probation Unit. We agree with the Fifth Circuit's statement that "[a] concept of loyalty that sweeps so broadly is not one that may legitimately trump compelling interests in speaking on matters of public concern." *Kinney v. Weaver*, 367 F.3d 337, 366 (5th Cir. 2004) (en banc). More importantly, there is no evidence in the summary judgment record substantiating Wilson's allegations of disruption in the workplace.

**[13]** In balancing Clairmont's First Amendment right to testify truthfully pursuant to a subpoena against the justifications set forth above, we hold that the weak and largely unsupported administrative interests advanced by Wilson do not outweigh Clairmont's First Amendment free speech rights. Having concluded that Wilson is not entitled to summary judgment at step 4, we proceed to step 5.

### 5. *Wilson failed to show that Clairmont would have been terminated even absent his testimony*

**[14]** "[I]f the government fails the *Pickering* balancing test, it alternatively bears the burden of demonstrating that it 'would have reached the same [adverse employment] decision even in the absence of the [employee's] protected conduct.' " *Eng*, 552 F.3d at 1072 (alteration in original) (quoting *Thomas*, 379 F.3d at 808).

> This question relates to, but is distinct from, the plaintiff's burden to show the protected conduct was a substantial or motivating factor. It asks whether the "adverse employment action was based on protected

*and* unprotected activities," and if the state "would have taken the adverse action if the proper reason alone had existed."

*Id.* (quoting *Knickerbocker v. City of Stockton*, 81 F.3d 907, 911 (9th Cir. 1996)). This inquiry is "purely a question of fact" and "we must therefore once again assume the truth of the plaintiff's allegations." *Id.*

**[15]** Here, Clairmont submitted deposition testimony, emails among staff at SMH, and his termination letter, which suggest it was only after Clairmont's testimony and Wilson's subsequent threats of reprisal that SMH decided to terminate Clairmont. Because "[i]mmunity should be granted on this ground only if the state successfully alleges, without dispute by the plaintiff," that it would have taken the adverse action "even absent the questioned speech," we conclude that, in light of all the record evidence, Wilson has not met her burden on this issue and has, therefore, not demonstrated that she is entitled to summary judgment on this alternative ground. *See id.*

**[16]** In sum, on the basis of the summary judgment record, we hold that Clairmont has presented sufficient evidence to establish that his speech was constitutionally protected and that Wilson violated his First Amendment rights. Therefore, we must also examine whether it was clearly established that Clairmont's speech was constitutionally protected and that a reasonable official in Wilson's position would have understood that her actions would violate Clairmont's First Amendment rights at the time the alleged retaliation took place.

## C.  It was clearly established that Clairmont's speech was protected

As noted earlier, even where a plaintiff has presented sufficient evidence to show that his constitutional rights were violated, a government official may still be entitled to qualified

immunity. *Saucier*, 533 U.S. at 201. "If the right was not clearly established at the time of the violation, the official is entitled to qualified immunity." *CarePartners*, 545 F.3d at 876 (citing *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007)). Whether the law was clearly established is an objective standard; the defendant's "subjective understanding of the constitutionality of his or her conduct is irrelevant." *Fogel v. Collins*, 531 F.3d 824, 833 (9th Cir. 2008). Thus, we must determine only whether, in light of the existing law in 2007, a reasonable Manager of the Probation Services would have understood that her actions violated Clairmont's First Amendment right to free speech. *See id.*

The plaintiff bears the burden to show that the contours of the right were clearly established. However, " 'closely analogous preexisting case law is *not* required to show that a right was clearly established.' " *Robinson*, 566 F.3d at 826 (emphasis added) (quoting *Hufford v. McEnaney*, 249 F.3d 1142, 1148 (9th Cir. 2001)). While "there must be some parallel or comparable factual pattern[,] . . . the facts of already decided cases do not have to match precisely the facts with which [the government employer] is confronted." *Fogel*, 531 F.3d at 833; *see also Rivero v. City of San Francisco*, 316 F.3d 857, 865 (9th Cir. 2002) (stating that to defeat qualified immunity, a plaintiff must show that two legal propositions were clearly established: (1) that the speech was on a matter of public concern, and (2) that the employee's speech interests outweighed the government's legitimate administrative interests); *cf. Moran v. Washington*, 147 F.3d 839, 843 (9th Cir. 1998) (rejecting as overly abstract a district court's determination that a constitutional right was clearly established because "[d]ismissal based upon protected speech is impermissible"). Because there were cases that would have alerted a reasonable person in Wilson's position that it would be unlawful to retaliate against an employee for having testified in a criminal proceeding pursuant to a subpoena, we conclude that Clairmont's First Amendment rights were clearly established at the time of his alleged retaliatory firing.

**[17]** In *Robinson*, we held that, by 2005, it was clearly established that a public-employee witness had a First Amendment right to testify in a class-action lawsuit in which discrimination was at issue. 566 F.3d at 826. We so concluded because (1) the Supreme Court had already decided *Pickering*, "establishing that the First Amendment protects employee speech on matters of legitimate public concern," and (2) it was already clearly established that "only a real, not imagined, disruption might outweigh the expressive interests of the employee." *Id.* (internal quotation marks omitted). In addition, we noted that the type of testimony given by Robinson had been held to be a matter of public concern and that the justification given by the employer for the alleged retaliation had been held to be insufficient to justify retaliation for protected speech. *Id.*

**[18]** As noted in Part II.B.1, above, we have held previously that threats to public safety and the impartial judicial administration of domestic violence cases are issues of public concern. *Rendish*, 123 F.3d at 1224; *Hyland*, 972 F.2d at 1137. And in *Robinson*, we held that, as early as 2005, it was clearly established that a public employee's voluntary testimony relating to discrimination was a matter of public concern. 566 F.3d at 826. In light of our then existing case law, we conclude that, in 2007, it was clearly established that Clairmont's subpoenaed testimony related to an issue of public concern.

In addition, as stated in *Robinson*, it was clearly established by 2005 that for a government employer's legitimate administrative interests to outweigh an employee's right to engage in protected speech, the disruption had to be "real, not imagined." Wilson has not established that there was any disruption other than some concerns aired at a staff meeting. Indeed, Wilson's own declaration suggests that it was Clairmont's alleged poor performance that disrupted his working relationship with the Probation Unit and that Clairmont's testimony merely confirmed pre-existing concerns.

**[19]** Wilson's claim to qualified immunity can succeed only if we take the evidence in the light most favorable to her and draw all competing inferences in her favor; this is fatal to her argument. When we resolve all factual disputes and draw all reasonable inferences in Clairmont's favor, as we must, there is no support for Wilson's argument that Clairmont's testimony caused workplace disruption the quelling of which outweighed Clairmont's interest in engaging in protected speech. It was clearly established at the relevant time that Wilson's proffered evidence of disruption in the workplace was woefully insufficient. *Robinson*, 566 F.3d at 826 (holding that factual disputes about the extent of the workplace disruption and about whether the justifications asserted by the defendant were pretextual precluded a finding of disturbance sufficient to outweigh a public employee's right to engage in protected speech). We therefore agree with Clairmont that the law was clearly established at the time of his alleged retaliatory firing.

### III.   Conclusion

**[20]** For all of the above reasons, we conclude that Clairmont has presented sufficient evidence from which a reasonable fact-finder could conclude that Wilson violated Clairmont's First Amendment rights when she played a substantial role in Clairmont's retaliatory firing. Clairmont has also established that his right to testify truthfully in response to a subpoena on issues related to public safety and discrimination was clearly established at the time of his testimony and termination. Under these circumstances, the district court erred in concluding that Wilson was entitled to qualified immunity. Accordingly, we reverse the district court's grant of summary judgment to Wilson and remand for trial.

DISMISSED in part; AFFIRMED in part; REVERSED in part and REMANDED. Plaintiff-Appellant shall recover his costs on appeal.