**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| RILEY'S AMERICAN HERITAGE FARMS, a California corporation; JAMES PATRICK RILEY, an individual, *Plaintiffs-Appellants*, | No. 20-55999 |
| | D.C. No. 5:18-cv-02185-JGB-SHK |
| v. | |
| JAMES ELSASSER; STEVEN LLANUSA; HILARY LaCONTE; BETH BINGHAM; NANCY TRESER OSGOOD; DAVID S. NEMER; ANN O'CONNOR; BRENDA HAMLETT, *Defendants-Appellees*, | ORDER AND AMENDED OPINION |
| and | |
| CLAREMONT UNIFIED SCHOOL DISTRICT, *Defendant*. | |

Appeal from the United States District Court
for the Central District of California
Jesus G. Bernal, District Judge, Presiding

Argued and Submitted August 31, 2021
Pasadena, California

Filed March 17, 2022
Amended April 29, 2022

Before:  Sandra S. Ikuta, Mark J. Bennett, and
Ryan D. Nelson, Circuit Judges.

Order;
Opinion by Judge Ikuta

## SUMMARY[*]

### Civil Rights

The panel (1) amended its opinion affirming in part and reversing in part the district court's summary judgment for public school defendants in a 42 U.S.C. § 1983 action alleging First Amendment violations, (2) denied a petition for rehearing, (3) denied a petition for rehearing en banc on behalf of the court, and (4) ordered that no further petitions shall be entertained.

Plaintiff James Patrick Riley is one of the principal shareholders of Riley's American Heritage Farms ("Riley's Farm"), which provides historical reenactments of American events and hosts apple picking.  Between 2001 and 2017, schools within the Claremont Unified School District booked

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

and attended field trips to Riley's Farm.  In 2018, Riley used his personal Twitter account to comment on a range of controversial social and political topics.  After some parents complained and a local newspaper published an article about Riley and his Twitter postings, the School District severed its business relationship with Riley's Farm.  Patrick Riley and Riley's Farm brought suit against the School District, individual members of the school board, and three school administrators (the "School defendants"), alleging retaliation for protected speech.

In partially affirming the district court's summary judgment in favor of the School defendants, the panel held that although there was a genuine issue of material fact on the issue of whether the Riley plaintiffs' First Amendment rights had been violated, the individual School defendants were entitled to qualified immunity as to the damages claims because the right at issue was not clearly established when the conduct took place.

In reaching this conclusion, the panel first determined that the relationship between the Riley plaintiffs and the School District was analogous to those between the government and a government contractor and that the character of the services provided by the Riley plaintiffs justified the application of the framework established in *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968).  Applying the two-step burden-shifting approach for government contractors alleging retaliation, the panel held that the plaintiffs had established a prima facie case of retaliation against the School defendants that could survive summary judgment.  The panel held that there was no dispute that Riley engaged in expressive conduct, that some of the School defendants took an adverse action against Riley's Farm that

caused it to lose a valuable government benefit and that those defendants were motivated to cancel the business relationship because of Riley's expressive conduct. The panel also held that there was sufficient evidence that the Board members had the requisite mental state to be liable for damages for the ongoing constitutional violation.

Because the Riley plaintiffs had carried their burden of making a prima facie case of retaliation, the burden shifted to the School defendants. The panel held that taking the evidence in the light most favorable to the Riley plaintiffs, the School defendants failed to establish that the School District's asserted interests in preventing disruption to their operations and curricular design because of parental complaints were so substantial that they outweighed Riley's free speech interests as a matter of law.

The panel rejected the School defendants' argument that they could not be held liable for unconstitutional retaliation because their actions were protected government speech. Even assuming that the selection of a field trip venue was protected government speech, the pedagogical concerns underlying the government-speech doctrine did not exist here because Riley was not speaking for, or on behalf of, the School District.

The panel held that although there existed a genuine issue of material fact as to whether the School defendants violated the Riley plaintiffs' First Amendment rights, there was no case that placed the constitutional inquiry here beyond debate and therefore it was not clearly established that the School defendants' reaction to parental complaints and media attention arising from Riley's tweets was unconstitutional. Rather, the School defendants had a heightened interest in

taking action in response to the Riley plaintiffs' speech to prevent interruption to the school's operations. The record contained undisputed facts that Riley's tweets gave rise to actual parent and community complaints and media attention. The School defendants were therefore entitled to qualified immunity on the damages claim.

The panel held that the district court erred in dismissing the claims for injunctive relief which sought to enjoin the School District's alleged ongoing policy barring future field trips to Riley's Farm. The panel held that the testimony of the School District's superintendent was sufficient to create a genuine issue of material fact as to whether the Riley plaintiffs continue to suffer from an ongoing constitutional violation.

**COUNSEL**

Thomas J. Eastmond (argued) and David A. Robinson, Holland & Knight LLP, Irvine, California; William J. Becker, Jr. and Jeremiah D. Graham, Freedom X, Los Angeles, California; for Plaintiffs-Appellants.

Daniel S. Modafferi (argued) and Golnar J. Fozi, Meyers Fozi & Dwork, LLP, Carlsbad, California, for Defendants-Appellees.

## ORDER

The opinion filed on March 17, 2022, and published at 29 F.4th 484 (9th Cir. 2022), is amended by the opinion filed concurrently with this order.

With these amendments, appellants' petition for rehearing, filed March 31, 2022, is **DENIED**. The petition for rehearing en banc was circulated to the judges of the court, and no judge requested a vote for en banc consideration. The petition for rehearing and petition for rehearing en banc are **DENIED**. No further petitions for rehearing or rehearing en banc will be entertained.

## OPINION

IKUTA, Circuit Judge:

This case involves a school district that severed its longstanding business relationship with a company that provides field trip venues for public school children. The school district took this step after the principal shareholder of the field trip vendor made controversial tweets on his personal social media account, and some parents complained. In response to the school district's adverse action, the field trip vendor and its shareholder sued the responsible public school officials under 42 U.S.C. § 1983 for violating their First Amendment rights. We conclude that there is a genuine issue of material fact whether the plaintiffs' First Amendment rights have been violated, but the school officials are entitled to qualified immunity as to the plaintiffs' damages claims because the right at issue was not clearly established when the conduct took place. However, the district court erred in

granting summary judgment to the school officials on the plaintiffs' claim for injunctive relief, because there is a genuine issue of material fact whether the school officials are maintaining an unconstitutional, retaliatory policy barring future patronage to the vendor.

I

James Patrick Riley is one of the principal shareholders of Riley's American Heritage Farms ("Riley's Farm").[1] Riley's Farm provides historical reenactments of events such as the American Revolution, the Civil War, and American colonial farm life for students on school field trips, and also hosts events like apple picking. During each year between 2001 and 2017, one or more schools within the Claremont Unified School District (referred to as CUSD or the "School District") booked and attended a field trip to Riley's Farm. The School District is governed by a publicly-elected, five-member Board of Education (the "Board"), and is managed on a day-to-day basis by its administrators.

As of August 2018, Riley and Riley's Farm maintained separate social media accounts, including accounts on Twitter. Riley used his personal Twitter account to comment on a range of controversial topics, including President Donald Trump's alleged relationship with Stormy Daniels, President Barack Obama's production deal with Netflix, Senator Elizabeth Warren's heritage, and Riley's opinions on gender identity. Some of Riley's controversial tweets included the following:

---

[1] We refer to Riley and Riley's Farm individually where appropriate, and collectively as the "Riley plaintiffs."

- When #ElizabethWarren comes on @MSNBC, it's therapeutic to issue a very earthy Cherokee war chant ('hey-ah-hey-ah..etc) I'm doing it right now. I'm running around; I'm treating the various desk lamps like mesquite campfires. You can probably hear it in Oklahoma. #ScotusPick

- A friend saw an ice sculpture of Kirsten Gillibrand at a Democratic fundraiser. She actually looked more human that way - a bit more color in her cheeks.

- So I'm planning a high school reunion and I just realized we may have been the last generation born with only two genders.

- #NameThatObamaNetflixShow "Missing ISIS" Heartwarming story of a former Jihad fighter, now readjusting to life as a BLM protester.

Riley's tweets did not appear on any of Riley's Farm's social media accounts or web site. Nor did Riley's tweets reference Riley's Farm or anything related to the School District or school field trips in general.

In August 2018, a parent of a kindergarten student at Chaparral Elementary School (one of the schools within the School District) sent an email to her child's teacher, Michelle Wayson, regarding an upcoming field trip at Riley's Farm. The parent's email included screen shots of Riley's tweets, and stated "I do NOT feel comfortable with my son patronizing an establishment whose owner (and/or family/employees) might be inclined to direct bigoted opinions towards my child or other vulnerable children in the group." Wayson forwarded the parent's email to the school

principal, Ann O'Connor.  Because all four of Chaparral's kindergarten classes were scheduled to attend an apple-picking tour at Riley's Farm in October 2018, O'Connor asked Wayson to discuss the parent's concern with the other three Chaparral kindergarten teachers and to determine whether alternative field trip venues would be more appropriate.  Brenda Hamlett, the principal of Sumner Danbury Elementary School (also in the School District), reported that multiple parents subsequently asked her to excuse their children from attending field trips at Riley's Farm or choose an alternative field trip venue.

Around the same time, Lee Kane, a parent whose children had attended schools in CUSD, saw a Facebook post discussing Riley's tweets.  In September 2018, Kane sent a copy of the Facebook post to David Nemer, one of the School District's board members, and expressed concern about the School District sending field trips to Riley's Farm "in light of a public controversy surrounding tweets" made by Riley.[2]

The same day, Nemer forwarded Kane's complaint to James Elsasser, the superintendent of the School District. Nemer told Elsasser: "There is concern on Facebook about some extremely inappropriate and unacceptable tweets by the owner of an establishment in Oak Glen that has apparently been visited by CUSD field trips."  In that same email, Nemer further described Riley's tweets as "obnoxious" and "bigoted."  Nemer followed up his email to Elsasser with a

---

[2] Nemer says he also recalled "that other Claremont Unified School District residents and/or parents, whose names I do not recall, commented on that post, expressing similar concerns," though it is not clear whether they communicated directly with Nemer.

second email stating, "I think many of our stakeholders would be uncomfortable with these tweets."**[3]**

Two days later, Elsasser and School District administrators met to discuss parent concerns regarding field trips to Riley's Farm. Elsasser asked the administrators to speak with the teachers at their schools to determine whether any of them wanted to continue patronizing Riley's Farm. O'Connor then emailed the Chaparral kindergarten teachers and instructed them to "find another alternative" for the field trip that would not give rise to parental complaints.

The following day, the *Redlands Daily Facts* (a local newspaper) published a news article about Riley and his Twitter posts. The article was titled: "These tweets sparked social media outcry against owner of Riley's Farm in Oak Glen." The article noted that some community members were disgusted by Riley's alleged white supremacist views espoused in his tweets, and that Riley's tweets had been shared over 1,300 times on Twitter.

Because no administrator, teacher, or staff member expressed a desire to continue going to Riley's Farm, Julie Olesniewicz, the Assistant Superintendent for Educational Services, sent an email to the principals of each of the School District's elementary schools "asking that no CUSD school attend Riley's Farm field trips" and offering alternative

---

**[3]**  At his deposition in this case, Elsasser later agreed that he considered some of Riley's comments to be "racist, sexist, or homophobic."

options for the field trips.  The parties dispute whether Olesniewicz's guidance is still in place.[4]

After Olesniewicz sent her email to the elementary school principals, Nemer sent an email to Elsasser asking, "Is there any followup information I can convey about the Rileys Farm issue?"  Elsasser responded by email that "[a]ll schools that were scheduled to go to Riley's Farm that are operated by John Riley have been canceled."

About a week later, on September 24, 2018, counsel for Riley's Farm (Thomas Eastmond) sent a letter to Elsasser and the individual board members, alleging that the School District had issued a policy forbidding teachers from taking field trips to Riley's Farm in retaliation for Riley's political posts.  Alleging that this policy violated Riley's Farm's First Amendment rights, Eastmond's letter proposed terms of settlement.  In a letter dated October 2, 2018, the District's general counsel denied that the District had issued a policy forbidding teachers from taking field trips to Riley's Farm.

---

[4] The Riley plaintiffs' assertion that Olesniewicz's guidance is still in place is based on Elsasser's testimony at his deposition:

> *Riley plaintiffs' counsel*: "As far as you're concerned, this guidance requesting that no CUSD school attend Riley's Farm field trips, it's still in place; correct?"
>
> *Defendants' counsel*: "What did he say?"
>
> *Elsasser*: "The guidance is still in place.  We've never revisited it."

In opposing the Riley plaintiffs' motion for partial summary judgment, defendants' counsel argued that Elsasser was merely clarifying opposing counsel's statement.

She asserted that "[a]fter the District became aware of racist, sexist and homophobic statements published in social media by the proprietor of Riley's Farm, individual schools decided whether to sponsor field trips to Riley's Farm during the 2018-2019 school year." The general counsel also stated that "nothing in the First Amendment obligates the District to continue doing business with any individual or organization that makes public statements which are inimical to the District's educational mission." Therefore, the general counsel rejected Eastmond's settlement proposals.[5]

On October 12, 2018, Riley and Riley's Farm filed an action for violation of their civil rights under 42 U.S.C. § 1983, alleging that the School District, individual members of the school board (Steven Llanusa, Hilary LaConte, Beth Bingham, Nancy Treser Osgood, and David Nemer), and three school administrators (Elsasser, O'Connor, and Hamlett) violated the Riley plaintiffs' First Amendment rights by prohibiting teachers at Chaparral and Sumner Danbury Elementary Schools from patronizing Riley's Farm for school field trips, in retaliation for Riley's protected speech. The complaint sought both damages and injunctive relief against the defendants.

The district court dismissed the School District from the suit based on sovereign immunity.[6] The Riley plaintiffs moved for partial summary judgment on their claims against Elsasser and Nemer for damages. The School defendants

---

[5] The CUSD board members did not take part in the District's consideration of, or response to Eastmond's September 24, 2018 letter.

[6] We refer to the remaining defendants individually where appropriate, and collectively as the "School defendants."

moved for summary judgment as to all claims. The district court denied the Riley plaintiffs' motion for partial summary judgment and granted the School defendants' motions for summary judgment on the ground that they were entitled to qualified immunity. The Riley plaintiffs subsequently moved for reconsideration. *See* Fed. R. Civ. P. 59 and 60. In denying the motion, the court acknowledged that it erred in dismissing the claim for injunctive relief on the basis of qualified immunity, *see Pearson v. Callahan*, 555 U.S. 223, 242 (2009), but held the error was harmless because there was no evidence that the School defendants had a policy prohibiting future field trips to Riley's Farm.

II

The Riley plaintiffs appeal the district court's order granting summary judgment in favor of the School defendants and its order denying their motion for partial summary judgment on their claims against Elsasser and Nemer for damages. We review a district court's decision on summary judgment de novo. *See L. F. v. Lake Wash. Sch. Dist. #414*, 947 F.3d 621, 625 (9th Cir. 2020). We may consider the district court's denial of the Riley plaintiffs' motion for partial summary judgment because it was "accompanied by a final order disposing of all issues before the district court" and "the record has been sufficiently developed to support meaningful review of the denied motion." *Brodheim v. Cry*, 584 F.3d 1262, 1274 (9th Cir. 2009) (quoting *Jones–Hamilton Co. v. Beazer Materials & Services, Inc.*, 973 F.2d 688, 694 n.2 (9th Cir. 1992)). In considering the appeal of a district court's disposition of cross motions for summary judgment, we view the evidence for each of the motions "in the light most favorable to the nonmoving party" for that motion and determine "whether there are any genuine

issues of material fact and whether the district court correctly applied the relevant substantive law." *Lake Wash. Sch. Dist.*, 947 F.3d at 625 (quoting *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 832 (9th Cir. 2002)).

## III

We first consider the district court's grant of summary judgment in favor of the School defendants on the damages claim.

A government official is entitled to qualified immunity from a claim for damages unless the plaintiff raises a genuine issue of fact showing (1) "a violation of a constitutional right," and (2) that the right was "clearly established at the time of [the] defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (internal quotation marks omitted). We may address these prongs in either order. *See id*. at 236. We begin with the first prong, and determine whether the Riley plaintiffs raised a genuine issue of material fact that their First Amendment rights were violated.[7]

## A

The Riley plaintiffs claim that the School defendants retaliated against Riley and his company because he engaged in protected speech on his Twitter account. "'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for

---

[7] Because we must consider the merits of the Riley plaintiffs' constitutional claim in light of their request for injunctive relief, *see infra* at Section IV, judicial efficiency counsels us to begin with the first prong of the qualified immunity framework, *see Pearson*, 555 U.S. at 242.

engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim." *Id.* (internal quotation marks omitted).

Despite this general rule, the Supreme Court has recognized that the government may impose "certain restraints on the speech of its employees" that would be "unconstitutional if applied to the general public." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) (per curiam). As the Court explained, the government has "interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). "[T]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 676 (1996) (quoting *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality opinion)). The government's power to impose such restrictions, however, is not unbridled. Government employees cannot "constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Pickering*, 391 U.S. at 568.

In *Pickering*, the Court set out a framework to balance the competing interests between the government employer and

employee. This framework (sometimes referred to as the *Pickering* balancing test) "requires a fact-sensitive and deferential weighing of the government's legitimate interests" as employer against the First Amendment rights of the employee. *Umbehr*, 518 U.S. at 677. Although the Court first applied this framework to government employees, it extended its application to retaliation cases brought by government contractors because "the similarities between government employees and government contractors with respect to this issue are obvious." *Id*. at 674; *see also O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 721 (1996) (extending the *Pickering* framework to government contractors who had reason to believe their business with the government would continue "based on longstanding practice").

We have further extended the *Pickering* framework to a range of situations where "the relationship between the parties is analogous to that between an employer and employee" and "the rationale for balancing the government's interests in efficient performance of public services against public employees' speech rights applies." *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1101 (9th Cir. 2011). In this vein, we have held that the *Pickering* framework applied to a retaliation claim brought by a business vendor operating under a contract with the government for weatherization services, *Alpha Energy Savers v. Hansen*, 381 F.3d 917, 923 (9th Cir. 2004), to a claim by a domestic violence counselor employed by a private company that performed counseling services for a municipal court, *see Clairmont*, 632 F.3d at 1101–02, and to a claim by a volunteer probation officer, *Hyland v. Wonder*, 117 F.3d 405, 411 (9th Cir. 1997), *opinion amended on denial of reh'g*, 127 F.3d 1135 (9th Cir. 1997). By contrast, we have declined to

apply the *Pickering* framework to retaliation claims brought by regulated entities, where the relationship between the plaintiff and the government was akin to that of a licensee-licensor and bore no indicia of a typical employee-employer relationship. *See CarePartners, LLC v. Lashway*, 545 F.3d 867, 881–82 (9th Cir. 2008) (plaintiffs were owners and operators of state-licensed boarding homes); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314–15 (9th Cir. 1989) (plaintiffs were sellers and distributors of petroleum operating under city permits).

If a plaintiff's retaliation claim is subject to the *Pickering* framework, a court applies a two-step, burden-shifting approach. *See Alpha Energy Savers*, 381 F.3d at 923. First, a plaintiff must establish a prima facie case of retaliation. This requires the plaintiff to show that "(1) it engaged in expressive conduct that addressed a matter of public concern; (2) the government officials took an adverse action against it; and (3) its expressive conduct was a substantial or motivating factor for the adverse action." *Id.* This final element of the prima facie case requires the plaintiff to show causation and the defendant's intent. Because § 1983 itself contains no intent requirement, we look to the underlying constitutional violation alleged. *See Daniels v. Williams*, 474 U.S. 327, 330 (1986). Where, as here, a plaintiff alleges First Amendment retaliation, the plaintiff must show that the government defendant "acted with a retaliatory motive." *Nieves*, 139 S. Ct. at 1722; *see also Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016) ("To win [a retaliation claim], the employee must prove an improper employer motive."). Put another way, a plaintiff must establish that the defendant was motivated (or intended) to take the adverse action because of the plaintiff's expressive conduct. *See Nieves*, 139 S. Ct. at 1722.

If the plaintiff carries its burden of showing these three elements, the burden shifts to the government. *Alpha Energy Savers*, 381 F.3d at 923. The government can avoid liability in one of two ways. First, the government can demonstrate that its "legitimate administrative interests in promoting efficient service-delivery and avoiding workplace disruption" outweigh the plaintiff's First Amendment interests. *Id.* (citing *Pickering*, 391 U.S. at 568). Second, the government can show that it would have taken the same actions in the absence of the plaintiff's expressive conduct. *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). A plaintiff cannot establish unconstitutional retaliation "if the same decision would have been reached" absent the protected conduct, even if "protected conduct played a part, substantial or otherwise," in motivating the government's action. *Mt. Healthy*, 429 U.S. at 285 (internal quotations omitted).

## B

We now turn to the question whether the Riley plaintiffs raised a genuine issue of material fact that their First Amendment rights were violated, and therefore the district court erred in granting summary judgment to the School defendants. We consider the facts in the light most favorable to the Riley plaintiffs. *See Lake Wash. Sch. Dist.*, 947 F.3d at 625.

## 1

To answer this question, we must first determine whether the *Pickering* framework applies to the Riley plaintiffs' claim

of retaliation.[8]  The Riley plaintiffs assert that the framework does not apply because their relationship to the School District was more akin to that of a private citizen than a government contractor.  We disagree.

First, courts have frequently concluded that when a governmental entity outsources government services for performance by a private company, the relationship between the parties is analogous to that between the government and a government contractor.  *See Clairmont*, 632 F.3d at 1101–02; *see also Umbehr*, 518 U.S. at 679; *O'Hare*, 518 U.S. at 714–15.  As in *Clairmont*, where a municipal court relied on a private company to provide counseling services to probationers, *see* 632 F.3d at 1101–02, the School District here relied on Riley's Farm to provide educational services for public school students.  Therefore, even though the record does not demonstrate that the Riley plaintiffs were categorized under California law as an "independent contractor," or that they had a written contract for services with the School District, the relationship between the Riley plaintiffs and the School defendants is analogous to those we have recognized between the government and a government contractor.  *See, e.g.*, *id.*; *Alpha Energy Savers*, 381 F.3d at 923.

Second, the rationale for balancing the government's interest in efficient performance of public service against the

---

[8]  We reject the Riley plaintiffs' argument that, because the School defendants did not file a protective cross appeal on the district court's holding, we are bound by the district court's finding that the *Pickering* framework does not apply to their First Amendment claim.  An appellee may raise arguments that were rejected below without filing a cross-appeal.  *See Rivero v. City and County of San Francisco*, 316 F.3d 857, 862 (9th Cir. 2002).

contractor's free speech rights is applicable here.  *See Clairmont*, 632 F.3d at 1101–02.  Because the Riley plaintiffs hosted field trips for students, the School District had an interest in ensuring that the services performed by Riley's Farm "were properly provided." *Id.* at 1102.  Those interests included ensuring the students' safety and maintaining the School District's intended curricular design for the trips.  We conclude that the character of the services provided by the Riley plaintiffs to the School District implicate the type of heightened government interests that the Court and our circuit have determined justify the application of the *Pickering* framework to a retaliation claim.  *See Umbehr*, 518 U.S. at 674; *Clairmont*, 632 F.3d at 1101–02.  The district court erred in holding to the contrary.

Having determined that the *Pickering* framework applies to the Riley plaintiffs' First Amendment claim, we now apply the two-step, burden-shifting approach for government contractors alleging retaliation.  *See Umbehr*, 518 U.S. at 673; *Alpha Energy Savers*, 381 F.3d at 923.

We first consider whether the Riley plaintiffs have established a prima facie case of retaliation that can survive summary judgment.  The first element of the prima facie case requires that the contractor engaged in expressive conduct that addressed a matter of public concern, a category of conduct that "lies at the heart of the First Amendment." *Lane v. Franks*, 573 U.S. 228, 235 (2014).  There is no genuine issue of disputed fact that Riley engaged in such expressive conduct.  Riley's tweets discussed matters that fall within the core of protected First Amendment activity including politics, religion, and issues of social relations.  *See Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018).

Nor is there a genuine issue of disputed fact that some of the School defendants took an adverse action against Riley's Farm. A plaintiff establishes the adverse action element of the prima facie case by demonstrating that the government action threatened or caused pecuniary harm, or deprived a plaintiff of some valuable government benefit. *Umbehr*, 518 U.S. at 674. This element is satisfied when the government cancels a for-profit contract with a contractor. *See Rivero*, 316 F.3d at 864. The cancellation of the field trips and prohibition of future field trips caused Riley's Farm to lose a valuable government benefit in the form of an expected pecuniary gain and an established business relationship with the School District. *See id.* at 865.

Finally, there is no genuine issue of disputed fact that some of the School defendants were motivated to cancel the longstanding business relationship with the Riley plaintiffs because of Riley's expressive conduct. The field trips and the longstanding business relationship were cancelled only after Nemer and CUSD parents raised concerns about the content of Riley's tweets to Elsasser, Hamlett, and O'Connor. In his deposition, Elsasser admitted that the decision was made to appease parents based on their concern about the content of Riley's speech. When coupled with the temporal relationship between the expressive conduct and the defendants' collective opposition to and adverse action against the Riley plaintiffs, Elsasser's admission is sufficient to raise a prima facie showing of retaliatory intent. *See Alpha Energy Savers*, 381 F.3d at 929. And Nemer and Elsasser's description of Riley's speech ("inappropriate," "unacceptable, "obnoxious", "bigoted," "homophobic", and "racist") further demonstrates the School defendants' intent to punish the Riley plaintiffs because of Riley's protected conduct. *See id.* Thus, the Riley

plaintiffs have made a prima facie case of First Amendment retaliation against Elsasser, Hamlett, O'Connor, and Nemer.

The School defendants argue that the Riley plaintiffs cannot satisfy the third element of the prima facie case because they have not shown that the defendants intended *to chill* Riley's speech. We disagree. A plaintiff need only show that the government intended "to retaliate against, obstruct, *or* chill the plaintiff's First Amendment rights." *Az. Students' Ass'n v. Az. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016) (emphasis added). Such reprisal could include terminating the government's relationship with the plaintiff entirely, rather than merely chilling the plaintiff's speech in the future. *See, e.g.*, *Alpha Energy Savers*, 381 F.3d at 922 (County's retaliatory acts included "'fixing it' so that [the plaintiff] would not receive further work from the County"); *Clairmont*, 632 F.3d at 1106 (evidence supported a finding that the municipal court pressured its contractor to fire the plaintiff because of his speech); *see also O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016); *Eng v. Cooley*, 552 F.3d 1062, 1074 (9th Cir. 2009) (holding that an employer's retaliation against an employee by "systematic investigations, prosecution, suspensions, and demotion" after the employee's protected conduct demonstrated that the conduct was a "substantial or motivating factor in the adverse employment action") (internal quotation marks omitted).

The prima facie case against Board members Llanusa, LaConte, Bingham, and Treser Osgood requires a different analysis. The Riley plaintiffs do not allege that these Board members took part in the cancellation of the field trips or the School District's severance of its relationship with the Riley plaintiffs. Nevertheless, because the Board members govern the School District, and have supervisory authority to stop the

adverse actions against the Riley plaintiffs, they may incur liability due to their knowledge and acquiescence in a constitutional violation. *See OSU Student All. v. Ray*, 699 F.3d 1053, 1075 (9th Cir. 2012). In *OSU Student Alliance*, the publisher of a conservative school newspaper sued university officials under § 1983 on the ground that the school retaliated against it by limiting the distribution of its newspaper on campus, pursuant to an unwritten policy. *See id.* at 1058–60. In addition to suing the director of facilities services, who had actually applied the policy to the newspaper, the plaintiff also sued the president and vice president of the university who had not been directly involved in enforcement of the policy, but had been informed about the application of the policy and done nothing to stop it. *See id.* at 1070–71. We held that "allegations of facts that demonstrate an immediate supervisor knew about the subordinate violating another's federal constitutional right to free speech, and acquiescence in that violation, suffice to state free speech violations under the First and Fourteenth Amendments." *Id.* at 1075. Therefore, the president and vice president of the university could be held liable under § 1983 for the continued enforcement of the retaliatory policy. *Id.* By contrast, the vice provost for student affairs, who merely received the "first email message complaining" about the policy, *id.* at 1078, and neither knew nor acquiesced in the decision to continue applying the policy to the paper, could not be held liable, *see id.* at 1078–79.

Here, taking the evidence in the light most favorable to the Riley plaintiffs, the Board members were made aware of the ongoing violation through Eastmond's demand letter, and

then failed to remedy the policy. *See id.*[9] Under *OSU Student Alliance*, this is sufficient to create a prima facie case that the Board members had the requisite mental state to be held liable for damages resulting from the ongoing constitutional violation (i.e., the ongoing policy prohibiting future trips to Riley's Farm). *See id.* at 1075.

2

Because the Riley plaintiffs have carried their burden of making a prima facie case of retaliation, the burden shifts to the School defendants to demonstrate that they took the adverse action because they had "legitimate countervailing government interests [that were] sufficiently strong" under the *Pickering* balancing test to "outweigh the free speech interests at stake." *Umbehr*, 518 U.S. at 675, 685.[10]

---

[9] We reject the Riley plaintiffs' argument that they need not establish the wrongdoer's retaliatory intent. The Court has repeatedly held that liability for retaliatory conduct requires proof of the defendant's retaliatory intent. *See Nieves*, 139 S. Ct. at 1722; *Heffernan*, 578 U.S. at 272. *O'Brien*, 818 F.3d at 932, cited by the Riley plaintiffs, required a plaintiff to prove that a defendant intended to (or was motivated to) take adverse action because of a plaintiff's protected conduct. *Blair v. Bethel School Dist.*, also cited by the Riley plaintiffs, is inapposite, because that case involved an elected official who was not shielded by the First Amendment from the ordinary "give-and-take of the political process." 608 F.3d 540, 543 (9th Cir. 2010).

[10]    The question whether the government has met its burden of justifying its adverse action under *Pickering* is a question of law, but may raise "underlying factual disputes that need to be resolved by a fact-finder." *Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900, 911 (9th Cir. 2021). A fact-finder's role in the *Pickering* analysis is limited to resolving those genuine disputes of historical fact necessary for the court to make its legal determination under *Pickering*. *See id.* Thus, a district court has discretion in "fashioning the most efficient way to resolve these

The government may demonstrate such legitimate countervailing interests by providing evidence that a contractor's expressive conduct disrupted the government workplace through, for example, interfering with the government services or operations provided by the contractor. *See Alpha Energy Savers*, 381 F.3d at 923. When asserting such an interest, the government "must demonstrate actual, material and substantial disruption, or reasonable predictions of disruption in the workplace." *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009) (internal quotation marks omitted). Evidence that actual disruption has already occurred in the workplace "will weigh more heavily against free speech." *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 749 n.2 (9th Cir. 2001). But "[t]he employer need not establish that the employee's conduct *actually* disrupted the workplace—'reasonable predictions of disruption' are sufficient." *Nichols v. Dancer*, 657 F.3d 929, 933 (9th Cir. 2011) (citation omitted). The government is more likely to meet its burden when an employee's disruptive conduct takes place in the workplace, compared to when the same conduct occurs "during the employee's free time away from the office." *Clairmont*, 632 F.3d at 1107 (citing *Connick v. Myers*, 461 U.S. 138, 153 (1983)); *see also Melzer v. Bd. of Educ. of City Sch. Dist. of City of New York*, 336 F.3d 185, 197 (2d Cir. 2003). While it "may rely on the possibility of future disruption," the government must support its claim that it reasonably predicted disruption "by some evidence, not rank speculation or bald allegation." *Nichols*, 657 F.3d at 934.

---

factual disputes" prior to its *Pickering* ruling (e.g., a special jury verdict form). *Id.*

Where public school officials assert that their interest in taking adverse action against a plaintiff was to avoid disruption to the school's operations and curricular design, courts consider whether students and parents have expressed concern that the plaintiff's conduct has disrupted the school's normal operations, or has eroded the public trust between the school and members of its community. *See Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 475–76 (3d Cir. 2015). Because schools act *in loco parentis* for students, *see Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995), school officials can reasonably predict that parents and students will fear the influence of controversial conduct on the learning environment, *see Melzer*, 336 F.3d at 199. The disruption "created by parents can be fairly characterized as internal disruption to the operation of the school, a factor which may be accounted for in the balancing test and which may outweigh a public employee's rights." *Id.*

The government's evidence of disruption may be deemed substantial if parents are so concerned with controversial conduct that they choose (or threaten) to "remove their children from the school, thereby interrupting the children's education, impairing the school's reputation, and impairing educationally desirable interdependency and cooperation among parents, teachers, and administrators." *Id.* In this context, the Second Circuit held there was substantial disruption justifying the government's adverse action against a public school teacher who was active in a pedophile association, where nearly 60 parents expressed concern that the teacher's controversial beliefs implicated the safety and well-being of the young students, and hundreds of students staged an assembly to share their views on the controversy. *See id.* at 191, 198–99. In particular, the court credited the school's claim that substantial disruption to its operations and

its relationship with the parents arose from the parents' threats to remove children from school.  *See id.* at 199. Despite explaining that the teacher's First Amendment interest in advocating for controversial political change was of the "highest value," *id.* at 198, the court held that the school's evidence of disruption justified its actions under the *Pickering* balancing test, *see id.* at 198–99.  Likewise, the Third Circuit held that where a school received complaints from hundreds of parents about a teacher's blog that criticized her students, the school's assessment that the teacher's expression of disgust towards her students would disrupt her teaching duties and erode the trust between herself and her students (and their parents) counted as substantial disruption to justify terminating her.  *See Munroe*, 805 F.3d at 473–74; *see also Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1119–20 (7th Cir. 2013) (holding that the government had a legitimate interest in preventing disruption arising from parent complaints about a school guidance counselor who wrote a hyper-sexualized advice book for women and dedicated the book to his students.).

Applying this framework here, and taking the evidence in the light most favorable to the Riley plaintiffs, the School defendants have failed to establish that the School District's asserted interests in preventing disruption to their operations and curricular design because of parental complaints were so substantial that they outweighed Riley's free speech interests as a matter of law.

First, we give less weight to the government's concerns about the disruptive impact of speech outside the workplace context.  *See Rankin v. McPherson*, 483 U.S. 378, 388–89 (1987); *Clairmont*, 632 F.3d at 1107.  Riley's controversial tweets were made on his personal Twitter account, and did

not mention or reference the School District or field trips to Riley's Farm in general. There are no allegations that Riley made (or planned to make) any controversial statements during a school field trip; indeed, there are no allegations that he interacted at all with the students during the field trips. Although Riley's tweets became associated with the School District due to some local media attention and posts on Facebook, taking the evidence in the light most favorable to the Riley plaintiffs, the attenuated relationship between Riley's controversial speech and the field trips themselves weighs against the School District's asserted interest in preventing disruption to its operations and curricular design.

Nor has the school demonstrated any actual disruption to its operations arising from Riley's speech. *See Keyser*, 265 F.3d at 749. The School defendants have provided the substance of two complaints from parents, only one of which involved a student currently enrolled in the School District.[11] While Hamlett asserted that multiple parents asked the Sumner Danbury principal to either excuse their children from the field trips or choose an alternative venue, there is no evidence regarding the number of parents or the nature of those complaints. This is far afield from cases where the government gave weight to hundreds of parent and student complaints. *See Melzer*, 336 F.3d at 190–91 (record showed that nearly 60 parents and hundreds of students complained about the teacher's proximity to students); *Munroe*, 805 F.3d at 473–74 (school received complaints about teacher from hundreds of parents).

---

[11] Moreover, there is a dispute whether that child was even scheduled to attend a field trip to Riley's Farm, or whether the parent had confused Riley's Farm with another, unrelated apple-picking venue with a similar name.

Likewise, the School defendants have failed to provide evidence of likely future disruption that would entitle them to summary judgment as a matter of law. *See Nichols*, 657 F.3d at 935. Unlike the evidence in *Meltzer*, where hundreds of parents threatened to remove their children from school, the record here shows only a handful of parent requests that a child be excused from a single field trip. Such requests do not evidence the substantial disruption that may arise from a large number of parents threatening to remove their children from school.

Although evidence that the media or broader community has taken an interest in the plaintiff's conduct may also weigh in favor of the government's assertion of disruption, *see Moser*, 984 F.3d at 909–10, the sparse media attention to Riley's tweets demonstrated in the record does not weigh in favor of the School defendants. The *Redlands Daily Facts*'s article about Riley's tweets noted that there was a "social media outcry" against Riley's Farm, and reported that Riley's tweets had been shared some 1,300 times. But there is no evidence in the record that Riley's tweets were covered by any other newspapers or media, and no indication that the tweets received nationwide attention. *Compare Munroe*, 805 F.3d at 462–63 (noting that the teacher's controversial blog post was reported by the Huffington Post, and the teacher "appeared on ABC, CBS, NBC, CNN, Fox News, and other television stations," and was interviewed by "several print news sources, including the Associated Press, Reuters, *Time Magazine*, and the *Philadelphia Inquirer*"). Although the School defendants presented evidence that a number of district residents or parents commented on the Facebook post discussing Riley's tweets, this evidence provides little support, as the School defendants did not specify the nature or number of those comments. The attenuated relationship

between the content of the tweets and Riley's lack of involvement on the curricular aspects of the field trip diminish the impact of the media coverage on the School District's asserted interests.

We balance these minor occurrences against Riley's interest in engaging in controversial, unique political discourse on his personal Twitter account. Those tweets are "entitled to special protection" given their contribution to the public political discourse. *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).

In light of these considerations, the School defendants fall short of justifying their adverse actions against the Riley plaintiffs as a matter of law at summary judgment. While there is a genuine issue of historical fact about the degree of controversy arising from the speech (i.e., the extent of actual and predicted disruption in the learning environment), the record as currently developed, viewed in the light most favorable to the Riley plaintiffs, *see Lake Wash. Sch. Dist.*, 947 F.3d at 625, does not justify the School defendants' adverse action.

On the other hand, these same considerations lead us to reject the Riley plaintiffs' argument that they are entitled to partial summary judgment on their claims against Elsasser and Nemer for damages. Taking the facts in the light most favorable to those defendants, *see id.*, there remains a genuine issue of material fact as to the amount of disruption to the School District arising from Riley's tweets.

Finally, we consider whether the School defendants can avoid liability by demonstrating that they would have taken the same adverse actions against the Riley plaintiffs absent

Riley's tweets. *See Mt. Healthy*, 429 U.S. at 287. The School defendants have not done so. To the contrary, they have admitted that they took the action directly in response to parent concerns about Riley's speech. There is no genuine issue of disputed fact that the School defendants would not have cancelled the relationship with the Riley plaintiffs absent Riley's speech.

In light of this conclusion, we hold that the Riley plaintiffs have established that there is a genuine issue of material fact regarding whether the School defendants violated the Riley plaintiffs' First Amendment rights.

3

Independent from their argument that they were entitled to take adverse action against the Riley plaintiffs to avoid disruption pursuant to the *Pickering* balancing test, the School defendants raise the separate argument that they cannot be held liable for unconstitutional retaliation because their actions were protected government speech. We disagree. The government has broader authority to regulate its own speech, or speech that a reasonable observer may view as the government's own, *see, e.g.*, *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1013–14 (9th Cir. 2000); *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 969–70 (9th Cir. 2011), but not speech that cannot be reasonably viewed as coming from the government, *see Downs*, 228 F.3d at 1013, 1017.

To determine whether speech can be reasonably viewed as coming from the government, we look to non-exhaustive factors, including (i) who was directly responsible for the speech, (ii) who had access to the forum in which the speech

occurred, (iii) who maintained editorial control over that forum, and (iv) the purpose of the forum. *See Downs*, 228 F.3d at 1011–12. Applying this framework, we have held that a school district did not violate a teacher's First Amendment right by preventing the teacher from posting alternative views on homosexuality on a school-sponsored and school-maintained bulletin board. *See id.* at 1017. Nor did a school district violate the First Amendment by requiring a teacher to remove banners from his classroom that advocated the teacher's religion. *See Johnson*, 658 F.3d at 970; *see also Planned Parenthood v. Clark County School District*, 941 F.2d 817, 819, 829 (9th Cir. 1991) (en banc) (holding that a school district could decline to accept advertisements regarding abortion services in school publications because the school officials reasonably believed the advertisements may "put the school's imprimatur on one side of a controversial issue").

These principles are not implicated here. Although the information and speech Riley's Farm presents to school children may be deemed to be part of the school's curriculum and thus School District speech, the School defendants do not assert that the allegedly offensive tweets were made by or at Riley's Farm. All of the speech deemed offensive by the School District was made by Riley on his personal Twitter account. His tweets did not mention the School District or the field trips. There is no evidence here that a reasonable observer would view Riley's speech as the School District's speech. *See Planned Parenthood*, 941 F.2d at 829. Thus, even assuming the School District is correct that the selection of a field trip venue is protected government speech, the pedagogical concerns underlying the government-speech doctrine do not exist here because Riley was not speaking for,

or on behalf of, the School District. *See Downs*, 228 F.3d at 1011–12.

## C

Because there is a genuine issue of material fact regarding whether the School defendants violated the Riley plaintiffs' First Amendment rights (the first prong of the qualified immunity inquiry), we now turn to the second prong, whether the defendants violated a constitutional right that was clearly established at the time of the alleged violation. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). A government official "violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up). The "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks omitted).

The right to be free from First Amendment retaliation cannot be framed as "the general right to be free from retaliation for one's speech." *Reichle v. Howards*, 566 U.S. 658, 665 (2012). Rather, the right must be defined at a more specific level tied to the factual and legal context of a given case. *See id.* The question whether a public employee or contractor "enjoyed a clearly established right to speak" depends on "whether the outcome of the *Pickering* balance so clearly favored [the plaintiff] that it would have been patently unreasonable for the [government] to conclude that the First Amendment did not protect his speech." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 980 (9th Cir. 1998). Not surprisingly, there will rarely be a case that

clearly establishes that the plaintiff is entitled to prevail under the fact-sensitive, context-specific balancing required by *Pickering*. *See id.* at 979–80.

Applying these principles here, and taking the facts in the light most favorable to the Riley plaintiffs, we ask whether in September 2018, when these events occurred, it was clearly established that a school district could not cease patronizing a company providing historical reenactments and other events for students because the company's principal shareholder had posted controversial tweets that led to parental complaints.[12] We conclude that there was no case that placed the constitutional inquiry here "beyond debate," *Kisela*, 138 S. Ct. at 1152, and therefore it was not clearly established that the School District's reaction to parental complaints and media attention arising from Riley's tweets was unconstitutional.  Rather, the School defendants had a heightened interest, and thus more leeway, in taking action in response to the Riley plaintiffs' speech to prevent interruption to the school's operations. *See Pickering*, 391 U.S. at 570–73.  Although it is clearly established that a government employer's pretextual fear of a potential disruption, *see*

---

[12] We reject the Riley plaintiffs' framing of this question, as whether it is clearly established that "[w]hen a person has a pre-existing commercial relationship with a public agency," the "business patronage pursuant to that relationship [is] a 'valuable government benefit' which the agency may not take away based on the person's First Amendment [] protected speech."  This framing is at too high a level of generality, and is not adequately adjusted to account for the School District's interests in avoiding disruption to its operations under the *Pickering* test.  Although we agree that the facts of a prior case do not have to be identical to establish clearly established law, *see al-Kidd*, 563 U.S. at 741, "the clearly established law must be particularized to the facts of the case" at hand, *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation marks omitted).

*Robinson*, 566 F.3d at 826, or a claim of imagined workplace disruption for which "there is no support," *Clairmont*, 632 F.3d at 1110, cannot outweigh the First Amendment interests of a government employee or contractor, here the record contains undisputed facts that Riley's tweets gave rise to actual parent and community complaints and media attention.

Because the right at issue was not clearly established, the School defendants are entitled to qualified immunity on the Riley plaintiffs' damages claims. We therefore affirm the district court's grant of summary judgment to all School defendants on the Riley plaintiffs' claim for damages.[13]

IV

We next turn to the Riley plaintiffs' claim for injunctive relief against the School defendants, which seeks to enjoin the School District's alleged ongoing policy barring future field trips to Riley's Farm. The Riley plaintiffs assert that the district court erred in granting summary judgment to the School defendants on this claim because there is a genuine issue of fact whether the School District maintains such policy.

"Although sovereign immunity bars money damages and other retrospective relief against a state or instrumentality of a state, it does not bar claims seeking prospective injunctive relief against state officials to remedy a state's ongoing violation of federal law." *Az. Students' Ass'n*, 824 F.3d at

---

[13] We likewise affirm the dismissal of the Riley plaintiffs' request for punitive damages, because a court may not award punitive damages where compensatory damages cannot be awarded. *See Deland v. Old Republic Life Ins. Co.*, 758 F.2d 1331, 1339 n.4 (9th Cir. 1985).

865 (citing *Ex Parte Young*, 209 U.S. 123, 149–56 (1908)). To bring a claim for prospective injunctive relief, a plaintiff "must identify a practice, policy, or procedure that animates the constitutional violation at issue." *Id.* (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)); *see also Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 & n. 55 (1978).

To obtain injunctive relief for a violation of § 1983, a plaintiff must establish: "(1) actual success on the merits; (2) that it has suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that the balance of hardships justify a remedy in equity; and (5) that the public interest would not be disserved by a permanent injunction." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 784 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 610 (2020) (internal quotation marks omitted).

"[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Thus, evidence of an ongoing constitutional violation (i.e., a policy or practice) satisfies the second element of the injunctive relief test. *See id.* Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (quoting *Sammartano v. First Judicial District Court*, 303 F.3d 959, 974 (9th Cir. 2002)).

Applying this framework here, we conclude that the district court erred in dismissing the Riley plaintiffs' claim for injunctive relief. Because we have already concluded that there is genuine issue of material fact regarding whether the Riley plaintiffs have established a First Amendment violation, *see supra* at Section III.B.2, we must determine

whether there is a genuine issue of material fact that the violation is ongoing, *see Az. Students' Ass'n*, 824 F.3d at 865.

The district court held that there was no ongoing constitutional violation as a matter of law because the School District had no "standing, future-looking prohibition" against future field trips to Riley's Farm. We disagree. Elsasser's testimony that the "guidance [requesting that no CUSD school attend Riley's Farm field trips] is still in place," is sufficient to create a genuine issue of material fact as to whether the Riley plaintiffs continue to suffer from an ongoing constitutional violation. The district court's statement that "[i]t would be improper . . . to reverse a policy which does not exist" failed to view the plain text of Elsasser's testimony in the light most favorable to the Riley plaintiffs.[14]    Although the School defendants dispute the existence of an ongoing unconstitutional policy, we have held that equity favors injunctive relief under such circumstances because a defendant "cannot be harmed by an order enjoining an action" it purportedly will not take. *Melendres*, 695 F.3d at 1002. And although the School defendants argue that "no District school has expressed a desire to attend Riley's Farm," and therefore "no further consideration of this issue has been

---

**[14]** Moreover, the district court erred to the extent it held that the Riley plaintiffs did not have standing to seek injunctive relief because they were not in immediate danger of sustaining a future injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Because there is a genuine dispute of material fact regarding whether the School defendants maintain an ongoing policy in violation of the Riley plaintiffs' First Amendment rights, and the "deprivation of constitutional rights unquestionably constitutes irreparable injury," *Melendres*, 695 F.3d at 1002 (internal quotation marks omitted), the Riley plaintiffs have standing to seek injunctive relief.

necessary," that assertion does not contradict Elsasser's statement that the guidance remains in place.

The School defendants' argument that injunctive relief is not appropriate because parents have considerable influence on the School's choice of field trips, and therefore a different group of parents could decide to revisit the decision to continue patronizing Riley's Farm, does not alter our conclusion. If there is a policy preventing the School District from future patronage to Riley's Farm, the influence of parents on the decision-making process is beside the point. The policy would still be in place, and the Riley plaintiffs would continue to be subjected to it. Likewise, the fact that Elsasser testified that the School District is not currently booking field trips because of COVID-related concerns does not alter the conclusion that, once field trips resume, the School District would bar patronage to the Farm pursuant to the policy. Therefore, the district court erred in granting summary judgment in favor of the School defendants on the Riley plaintiffs' injunctive relief claim.

V

Finally, we address the School defendants' argument that the individual Board members are improper defendants in this suit because they played no part in the alleged constitutional violation, and therefore cannot be held liable as supervisors. Because the individual Board defendants are entitled to qualified immunity from the damages claim, *see supra* at Section III.C, we need only address whether those individuals are properly named defendants on the claim for injunctive relief.

A plaintiff seeking injunctive relief in a § 1983 action against the government "is not required to allege a named official's personal involvement in the acts or omissions constituting the alleged constitutional violation." *Colwell v. Bannister*, 763 F.3d 1060, 1070 (9th Cir. 2014) (citation omitted). Instead, "a plaintiff need only identify the law or policy challenged as a constitutional violation and name the official within the entity who can appropriately respond to injunctive relief." *Hartmann v. California Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013) (citing *L.A. Cnty. v. Humphries*, 131 S. Ct. 447, 452, 454 (2010)). Thus, a plaintiff seeking injunctive relief for an ongoing First Amendment violation (e.g., a retaliatory policy) may sue individual board members of a public school system in their official capacities to correct the violation. *See Az. Students' Ass'n*, 824 F.3d at 865; *Freedom From Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1138 (9th Cir. 2018) (noting that California school boards are the governing body for the school district).

The Riley plaintiffs have done just that. They have sued the individual Board defendants in their official capacity, requesting prospective injunctive relief to remedy the School District's ongoing retaliatory policy. The parties agree that the Board members govern the School District. This is consistent with the authority granted to the Board under the California Education Code, which vests it with the authority to "prescribe and enforce rules not inconsistent with law." Cal. Educ. Code § 35010(a), (b); *see also Freedom From Religion Found., Inc.*, 896 F.3d at 1138. Should the Riley plaintiffs prevail on their First Amendment claim for injunctive relief, the Board defendants are proper individuals to remedy a policy that continues to animate the School

District's ongoing constitutional violation. *See Az. Students' Ass'n*, 824 F.3d at 865.[15]

In sum, we affirm the district court's grant of qualified immunity on the Riley plaintiffs' claim for damages, and reverse the court's grant of summary judgment on the claim for injunctive relief.[16]

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.[17]**

---

[15]  Defendant Bingham is no longer a CUSD Board member, and therefore has no legal authority to remedy any ongoing violation of law. We therefore order her dismissed from the claim for injunctive relief. The record does not indicate whether any other defendants have likewise ceased serving in an official capacity for the School District, and therefore should also be dismissed from the claim for injunctive relief. The district court may make this determination on remand.

[16]  The Riley plaintiffs also appeal the district court's denial of their motion for reconsideration. We dismiss their appeal as moot with respect to the district court's grant of summary judgment on their injunctive relief claim. *See Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 n.1 (9th Cir. 1989). We affirm the district court's denial of the Riley plaintiffs' motion to reconsider with respect to the district court's grant of summary judgment on the Riley plaintiffs' damages claims. *See id.*

[17]  Each party shall bear its own costs on appeal.