NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



| | |
|---|---|
| CHERYL BISHOP, | No. 22-35139 |
| Plaintiff-Appellant, | D.C. No. 2:20-cv-01375-RSM |
| v. | |
| MERRICK B. GARLAND, Attorney General; et al., | MEMORANDUM* |
| Defendants-Appellees. | |

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Argued and Submitted February 14, 2023
Seattle, Washington

Before: PAEZ and VANDYKE, Circuit Judges, and LIBURDI,** District Judge.
Partial Dissent by Judge PAEZ.

Cheryl Bishop appeals the district court's order excluding evidence and granting summary judgment against her three Title VII discrimination claims. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

---

* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

** The Honorable Michael T. Liburdi, United States District Judge for the District of Arizona, sitting by designation.

Bishop argues that the district court abused its discretion in excluding evidence of conduct from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and Brad Devlin's conduct occurring before the 2019 settlement agreement. We review evidentiary rulings for abuse of discretion, reversing only "if the exercise of discretion is both erroneous and prejudicial." *Wagner v. Cnty. of Maricopa*, 747 F.3d 1048, 1052 (9th Cir. 2013).

In response to ATF's motion for summary judgment, Bishop relied on various facts predating the 2019 settlement. The district court concluded that, although these facts could serve as background, relying on these pre-settlement facts to state a claim would violate the parties' settlement agreement and would "allow Bishop to simply relitigate claims she has already settled." The court also denied Bishop's motion to strike ATF's argument that the court disregard pre-settlement facts.

Bishop argues that ATF failed to raise the exclusion of this evidence in its motion for summary judgment and thus forfeited the issue. But ATF sufficiently raised the point in its motion, quoting the settlement agreement and analyzing only post-settlement conduct.

Bishop also argues that *Dosier v. Miami Valley Broadcasting Corp.* allows the pre-settlement conduct to be considered as evidence of "the existence of a pattern or scheme." 656 F.2d 1295, 1300–01 (9th Cir. 1981). But her settlement agreement clearly forecloses the success of any claim "growing out of [Bishop's] employment

to date" with ATF or "arising out of" the litigation that resulted in settlement. And our decision in *Dosier*, which considered how res judicata affected the use of pre-settlement conduct, does not govern here, where the settlement agreement bars claims based on pre-settlement conduct. *See id.* at 1298–99. The district court did not abuse its discretion in excluding the evidence or denying Bishop's motion to strike.

Nor did the district court err in granting summary judgment against Bishop's Title VII claims. We review a grant of summary judgment de novo to determine whether there is any "genuine dispute of material fact after viewing the evidence in the light most favorable to the nonmoving party." *Henry v. Adventist Health Castle Med. Ctr.*, 970 F.3d 1126, 1130 (9th Cir. 2020) (cleaned up).

*First*, the court did not err in granting summary judgment against Bishop's disparate treatment claim. To succeed on a disparate treatment claim, a plaintiff must show that she suffered an "adverse employment action." *Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1012 (9th Cir. 2018). "[A]n adverse employment action is one that 'materially affects the compensation, terms, conditions, or privileges of employment.'" *Id.* (quotation omitted). The district court correctly concluded that Bishop did not suffer adverse employment action, reasoning that the "words [in the email], spoken by a former supervisor and shared widely, did not

result in any material change to Ms. Bishop's compensation, terms, conditions, or privileges of employment."

Bishop argues that ATF subjected her to an adverse employment action by not "correct[ing] the misimpression [Devlin] had created," because the email caused her to "experience[] chilly, isolating hostility" from her coworkers and "tended to undermine her team's confidence in her." But chilly treatment from coworkers is not an adverse employment action. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). And although Bishop speculates that ATF created a "physically dangerous workplace" for her by undermining her team's confidence in her, she offers only one occasion where she claims she felt unsafe. That occasion was when, sometime after the email, her team allegedly "disregarded her orders" in the field. But she provides no evidence that the agents had read Devlin's email or that their alleged disobedience was in any way connected to the email. Moreover, in the two and a half years after the email before her retirement in May 2021, Bishop received bonuses and a promotion. Bishop fails to show any adverse employment action for her disparate treatment claim.[1] We affirm summary judgment against her disparate treatment claim.

---

[1] Nor did the district court preclude Bishop from offering direct or circumstantial evidence of discriminatory motive and require Bishop to use the *McDonnell Douglas* burden-shifting framework, as Bishop argues.

4

*Second*, the court did not err in granting summary judgment against Bishop's hostile work environment claim. To succeed on a hostile work environment claim, a plaintiff must show that she was subject to unwelcome conduct that was "sufficiently severe or pervasive to alter the conditions" of her employment and "create an abusive working environment." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004) (quotation omitted). Bishop fails to present evidence of any adverse effects of the email, other than perceived ostracism from her coworkers and her opinion that the email had tarnished her reputation. This falls short of conduct that was sufficiently "severe or pervasive as to alter the conditions" of her employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (cleaned up). She also argues that, like in her disparate treatment claim, her safety was endangered by the email. But she again fails to tie any claimed endangerment to the email. We affirm summary judgment against her hostile work environment claim.

*Third*, the court did not err in granting summary judgment against Bishop's retaliation claim. To succeed on a retaliation claim, a plaintiff must show she suffered a "materially adverse" employment action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). That requirement is met when a plaintiff shows that the "challenged action … well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (cleaned up). The district

5

court concluded that Bishop failed to show an adverse employment action supporting her retaliation claim.

Bishop fails to offer evidence of an adverse employment action. She spends much of her attention on the email itself—but ATF did not send the email, one of her coworkers did.[2] Bishop argues that ATF can be liable for the email because ATF "ratified" the email through its inaction. But even assuming ATF could be liable for ratifying retaliatory conduct by its employees in some contexts, ATF did not ratify this email through inaction. Darek Pleasants, Devlin's supervisor, referred the matter to ATF's Internal Affairs Division for investigation, which referred the matter to the Department of Justice's Office of Inspector General, which then referred the matter back to Internal Affairs, which finally referred the matter back to Pleasants. By the time the matter had returned to Pleasants for his action, Devlin had retired. ATF's decision to take no further action following Devlin's retirement did not ratify the email through inaction.[3] *See Campbell*, 892 F.3d at 1017. Nor has Bishop shown

---

[2] The dissent points out that Devlin sent the email to more than one person and that the email was forwarded to additional people. Regardless of how many received it, however, it was still one email.

[3] The dissent criticizes the sufficiency of this investigation because, inter alia, ATF refused to send out a follow-up email "unless Bishop would agree to waive her legal claims." But the fact that ATF offered to send out another email if Bishop waived her claim does not imply that ATF believed such an email was legally necessary. Indeed, the Assistant Director of Field Operations testified he thought such an action was inappropriate because it would draw more "attention to the email." The dissent

6

that ATF supervisors "ratified" the email by forwarding it, especially because Bishop does not provide evidence that any supervisor with authority over her endorsed the content of the email by forwarding it. *Id.*

The dissent would conclude that, unless ATF censored Devlin or Devlin's coworkers for sending, forwarding, and responding to the email, it is liable for the email's contents and consequences. But ATF did not ratify the email. It instead took reasonable action given the context and content of the email.[4] Bishop had accused Devlin of racism in her initial lawsuit against ATF; Devlin responded to that charge by explaining in an email to his coworkers his position that he did not believe his actions were motivated by racism.[5] His email may have ignored basic principles of tact and civility, but it was nonetheless an act of self-defense against a charge of

---

also emphasizes that although Devlin's supervisor claims he admonished Devlin, Devlin disputed this admonishment ever occurred. Although the dissent is correct that this is a disputed fact, it is an immaterial dispute because the resolution of that fact is unnecessary to our decision.

[4] The dissent charges us with adopting two "internally inconsistent holdings," but in so arguing the dissent misrepresents our reasoning. We do not claim that "ATF had no obligation to act at all"—that is, that the ATF had "no obligation" to investigate. The ATF did investigate the email, and we conclude its investigation was reasonable. And, given the context, we conclude its ultimate decision following its investigation to not further "address" the email through affirmative action was also reasonable. There is no inconsistency.

[5] For example, Devlin explained that the reason he had a swastika tattoo was because of an undercover assignment in an Aryan Biker Club, a club that required the tattoo. After the assignment concluded, the agency refused to pay the substantial sum required to remove the tattoo.

racism. In situations like this, our sister circuits have concluded that "[a] person or entity accused of discrimination must be allowed to defend himself or itself" and have explained that those accused of discrimination "can explain their denials of discrimination allegations without fear that those denials might create additional liability." *Dixon v. Int'l Brotherhood of Police Officers*, 504 F.3d 73, 84 (1st Cir. 2007) (noting that "[t]here are limits on what speech can be proscribed as retaliatory"); *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 697 (4th Cir. 2018). This is especially true here, given that federal agencies, just as much as courts, are entitled to take First Amendment concerns into account. *Cf.* 5 U.S.C. § 1331 (requiring federal elected or appointed officials swear or affirm that they will "support and defend the Constitution of the United States").

Although those cases distinguish between "defending oneself … and threatening, intimidating, or otherwise interfering with someone's right to pursue a discrimination claim," Devlin's email was clearly defensive and not—contrary to the dissent's characterization—a threat, an act of intimidation, or interference with Bishop's right to pursue a discrimination claim. *Feminist Majority Found.*, 911 F.3d at 697 (alteration in original) (quoting *Dixon*, 504 F.3d at 84). Bishop's original claim against Devlin was that he engaged in racist misconduct. Although the dissent notes that Devlin "questioned Bishop's motives for engaging in protected activity, criticized her settlement with ATF for discrimination charges, and insulted her

character," those were the precise means by which Devlin defended himself against Bishop's charge of racism. For example, Devlin admitted that—as reported by a local newspaper—he had called Bishop a "trainwreck," but he argued that the criticism was "never based on [Bishop's] race." Instead, he said he called her that "based on her incompetence as an agent and lack of investigative experience." No one is defending the way that Devlin defended himself. But attempting to explain that prior actions were supposedly rooted in legitimate criticisms and not racially motivated is not—as the dissent claims—going "far beyond self-defense" against a charge of racism. *See id.* at 698 ("The fact that a response to a discrimination complaint calls into question the credibility of the complainants … does not make the response a materially adverse retaliatory action.").

Given that the First Amendment ordinarily entitles individuals to defend against public charges of misconduct, it makes sense that Title VII does not require employers to censor their employees' defensive speech. *See Mulligan v. Nichols*, 835 F.3d 983, 989 (9th Cir. 2016) ("Th[e] marketplace of ideas is undermined if public officials are prevented from responding to speech of citizens with speech of their own." (citation omitted)); *see also Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 646 (9th Cir. 2009) (explaining that the *Noerr-Pennington* doctrine immunizes conduct "incidental to the prosecution of [a] suit" so as to "preserve the breathing space required for the effective exercise of the rights the Petition Clause protects"

(cleaned up)). Accordingly, ATF acted reasonably and its mere inaction in declining to censor an employee's protected speech does not serve to ratify such speech. The dissent's approach would require employers to muzzle employees who attempt to defend themselves against public charges of misconduct. We ought not take that path, and we do not take it in this case.[6]

And again, assuming arguendo that ATF could be liable for what harm came from its response to the email—not from the email itself—Bishop must still show that a reasonable person in her position would not have filed the initial lawsuit because ATF responded as it did. *See Campbell*, 892 F.3d at 1021. She has made

---

[6] The dissent accuses us of "conjur[ing] a First Amendment issue out of thin air," violating the party-presentation principle. But recall that the reason the First Amendment is relevant here is to determine whether ATF ratified the email through inaction. ATF argued in its answering brief that Bishop's focus on Devlin's email was misplaced because ATF did not send the email. Bishop replied by arguing that ATF is liable for retaliation because it ratified the email—an argument that does not appear in her opening brief. It does not violate the party-presentation principle to explain why ATF is correct that it is not liable for Devlin's email and, in the process, reject Bishop's ratification argument raised for the first time in her reply brief. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (noting that the role of the court is to decide the "questions presented by the parties" (quotation omitted)); *see also Int'l Bhd. of Teamsters, Airlines Div. v. Allegiant Air, LLC*, 788 F.3d 1080, 1090 (9th Cir. 2015) ("We have discretion to consider an issue raised in a reply brief where, as here, an appellee raised an issue in its brief."). Moreover, contrary to what might be inferred from the dissent's exposition on the government's ability to regulate speech, we offer no conclusion on whether ATF would have violated the First Amendment if it had censored Devlin. We conclude only that this government agency's decision not to censor Devlin was reasonable given the obvious First Amendment concerns at play. It is thus the dissent, in opining on whether ATF could have censored Devlin in some hypothetical world where it did so, that "conjures a First Amendment issue out of thin air."

10

no such showing. She contends that she was humiliated, that "[h]er peers ignored her and avoided her," and she speculates that her team lost trust in her as a leader. These claimed consequences do not rise to the level of a materially adverse employment action. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (distinguishing materially adverse actions from "trivial harms"). Although she repeats her claim that her physical safety was endangered in a mission because her team was disobedient, she still fails to show that this disobedience was retaliatory or attributable to the email. The dissent's view that Bishop suffered a materially adverse employment action focuses on its judgment that the "act" itself was "material," ignoring Bishop's lack of any material consequences.

The dissent marshals a host of cases in an apparent effort to prove that we are wrong for affirming the district court's dismissal of Bishop's retaliation claim. The dissent points out that the majority of our sister circuits have "held that retaliatory harassment, including coworker harassments, *can* rise to the level of material adversity." *Feminist Majority Found.*, 911 F.3d at 694 (emphasis added). But we have assumed it is true that retaliatory harassment "*can* rise to the level of material adversity." *Id.* We instead conclude that ATF is not liable for Devlin's email because ATF did not ratify the email, and we have concluded that the consequences of ATF's response to the email do not amount to a materially adverse employment action. If the dissent intended to point its army of cases at these two conclusions,

11

they are irrelevant.  None of those cases hold that a government agency ratifies its employee's conduct when it declines to censor that employee's attempt to defend himself against a charge of serious misconduct, nor do they require holding that the consequences of ATF's response in this case amounted to a materially adverse employment action.

We affirm the district court's grant of summary judgment.

**AFFIRMED.**

*Bishop v. Garland*, No. 22-35139

Paez, J., dissenting in part:

I concur in the majority's affirmance of the evidentiary rulings, the hostile work environment claim, and the disparate treatment claim. I respectfully dissent, however, from the majority's decision to affirm summary judgment on Bishop's retaliation claim.

**1.** In rejecting Bishop's challenge to the disposition of her retaliation claim, the majority disregards the evidentiary record to reach its conclusion. This case did not involve *one* lone email sent by a disgruntled coworker. Rather, Bishop's coworker, Brad Devlin, sent copies of the email to 150 colleagues and partners at law enforcement agencies around the country. The email, among other things, called Bishop a "trainwreck," denigrated her work ethic, and suggested that she manufactured previous claims of racial discrimination as a strategy to recover damages against the government. The email was then forwarded widely to new recipients in and outside of ATF *for almost two more years*, without any attempt by ATF leadership to stop its spread. In fact, ATF supervisors forwarded the email themselves—Monique Villegas, Special Agent in Charge of the Arizona Field Division, responded directly to the email, "Amen, brother!" and then forwarded it to dozens of her subordinates. Other supervisors took similar actions.

1

To defend ATF's response, the majority adopts two separate and internally inconsistent holdings. First, the majority holds that ATF "took reasonable action" to address the email because a supervisor, Darek Pleasants, initiated a formal investigation. But Bishop has submitted compelling evidence disputing the legitimacy of that investigation, which the majority fails to view in her favor. *See Sandvik v. Alaska Packers Ass'n*, 609 F.2d 969, 974 (9th Cir. 1979). There is evidence that ATF refused to send out a corrective email or admonish employees not to spread the email unless Bishop would agree to waive her legal claims. Indeed, Deputy Assistant Director John Durastanti, a high-ranking ATF official, admitted that ATF considered sending out a "notice to the workforce on behalf of [Bishop]," but "no action was taken pending a negotiated resolution of [her EEO complaint]." Furthermore, Bishop asserted, and ATF officials admitted, that they never contacted her about the email, interviewed any witnesses, or even conducted a formal interview of Devlin about the incident. While Pleasants claimed that he verbally admonished Devlin, (which would have constituted the only discipline Devlin ever received), Devlin testified at his deposition that Pleasants never told him the email was inappropriate or ordered him not to share it further. All of this evidence directly contradicts the majority's conclusion that ATF acted reasonably. By dismissing every disputed fact as irrelevant, the majority takes the illogical

2

position that *any* investigation ATF undertook was reasonable—regardless of the steps that investigation entailed, or whether those steps even occurred.

Pivoting from ATF's actions, the majority adopts a second, contradictory holding: that ATF had no obligation to act at all because Devlin's email constituted First Amendment protected speech. It is unclear why the majority conjures a First Amendment issue out of thin air. Because ATF has never claimed that Devlin's email was an act of free speech, neither party briefed this issue. By raising a First Amendment issue on its own volition, the majority violates the principle of party presentation. *United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579, 1581-82 (2020) (citation omitted).

On the merits, the majority is wrong. The First Amendment does not guarantee employees a right to use their workplace emails for "act[s] of self defense against charge[s] of racism." To the contrary, "the Supreme Court has recognized that the government may impose 'certain restraints on the speech of its employees' that would be 'unconstitutional if applied to the general public.'" *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 720 (9th Cir. 2022) (citing *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) (per curiam)). Because the government has a more significant interest "in regulating the speech of its employees" than the "speech of the citizenry in general," *id.* (citation omitted), the First Amendment only protects employee speech "on matters of public concern,

3

typically matters concerning government policies that are of interest to the public at large." *City of San Diego,* 543 U.S. at 81; *see also Pickering v. Board of Ed. of Twp. High School Dist. 205*, *Will Cty.,* 391 U.S. 563, 568-69 (1968). Even then, the government can impose restrictions by demonstrating "that its legitimate administrative interests in . . . avoiding workplace disruption outweigh" the employee's free speech rights. *Riley's Am. Heritage Farms*, 32 F.4th at 721 (citation omitted) (describing the *Pickering* balancing test).

Brushing aside these principles, the majority jumps to the unfounded conclusion that Devlin's email was "protected speech." It was not. As a threshold matter, "speech by public employees addressing individual personnel disputes and grievances is not" speech related to public concern under the First Amendment. *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983); *see City of San Diego*, 543 U.S. at 82-83 (describing the public concern test as a "threshold inquiry"). Tellingly, the majority fails to cite any cases recognizing an employee's First Amendment right to rebut allegations of racism. The two cases the majority cites do not rely on the First Amendment nor categorize such speech as constitutionally protected. *See Feminist Majority Found. v. Hurley,* 911 F.3d 674, 697 (4th Cir. 2018); *Dixon v. Int'l Bhd. Police Officers,* 504 F.3d 73, 84 (1st Cir.

4

2007). The majority attempts to justify ATF's failure to act by invoking "First Amendment concerns" that do not exist.[1]

And even if, in some contexts, employees maintain a right to defend themselves against charges of misconduct, Devlin's email went far beyond self-defense. He questioned Bishop's motives for engaging in protected activity, criticized her settlement with ATF for discrimination charges, and insulted her character. The contents of the email were sufficiently offensive that ATF counsel believed Devlin might have violated ATF's policy against harassment in the workplace. As *Dixon* explains, "[t]here is an important difference between defending oneself, on the one hand, and threatening, intimidating, or otherwise interfering with someone's right to pursue a discrimination claim on the other." 504 F.3d at 84. A person denying a charge of discrimination does not have a "safe harbor . . . for any and all sort of speech in response." *Id.* Here, Devlin "did not limit his comments to defending" his own conduct, but rather "turned on" Bishop and launched unjustified attacks against her while "encouraging her colleagues to

---

[1]The majority says that it offers no conclusion on whether "ATF would have violated the First Amendment if it had censored Devlin," but only that it was "reasonable" for ATF "not to censor Devlin . . . given the obvious First Amendment concerns at play." Mem. 11 n.6. But the majority misses the point: there are no "First Amendment concerns at play" because Devlin's email is not First Amendment speech. The majority simply assumes that the First Amendment applies and that some vague "concerns" exist, while ignoring all of the caselaw that governs free speech rights in this context.

stand against her as well." *Id.* at 84. The law provides no protection for such speech, and nothing the majority cites counsels otherwise.

2.      The majority's decision is also wrong on Title VII grounds. ATF's failure to intervene in the face of coworker harassment can constitute an adverse employment action under Title VII's antiretaliation provision. As background, the Supreme Court has adopted a broad interpretation of adverse employment actions in the antiretaliation context. To prevail on a retaliation claim, one must only show that a challenged action is materially adverse, meaning it "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry Co. v. White*, 548 U.S. 53, 57 (2006). As the Court explained, "a limited construction" of the antiretaliation provision "would not deter the many forms that effective retaliation can take." *Id.* at 64. Hence, "[i]nterpreting the antiretaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends." *Id.* at 67.

Here, ATF allowed a disparaging email to spread unchecked for two years, in direct response to an employee's claims of racial discrimination. A reasonable jury could conclude that ATF's inaction "could well dissuade" a worker from making a discrimination charge. Indeed, "[a] clear majority of our sister circuits have . . . held that retaliatory harassment, including coworker harassment, can rise

6

to the level of material adversity." *Feminist Majority Found.*, 911 F.3d at 694; *see also Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 346 (6th Cir. 2008) (collecting cases from the Third, Ninth, Second, Tenth, and Seventh Circuits). [2] Several of these cases are similar to the case before us. For example, in *Knox v. State of Indiana*, the Seventh Circuit upheld a jury's finding that the state was liable under Title VII's antiretaliation provision for failing to address the actions of Knox's prison coworkers. 93 F.3d 1327, 1334-36 (7th Cir. 1996). The coworkers made "insulting and demeaning statements" about Knox "both to staff and in front of inmates" in retaliation for Knox bringing sexual harassment charges against a supervisor. *Id.* at 1331. Much like the plaintiff in *Knox,* Bishop contends that her coworkers (and several supervisors) circulated "insulting and demeaning

---

[2] For example, see *Moore v. City of Philadelphia*, 461 F.3d 331, 349 (3d. Cir. 2006) ("An employer may be liable under Title VII for retaliatory harassment perpetrated by an employee's co-workers"); *Richardson v. N. Y. State Dept. of Corr. Serv.*, 180 F.3d 426, 445 (2d Cir. 1999) ("[A]n employee suffers 'adverse employment action' for the purposes of a retaliation claim when . . . her employer allows her co-workers to harass her because she engaged in protected activity"); *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1265 (10th Cir. 1998) (explaining that "co-worker hostility or retaliatory harassment" can constitute an adverse employment action for a retaliation claim); *Wyatt v. City of Boston*, 35 F.3d 13, 15-16 (1st Cir. 1994) (recognizing "toleration of harassment by other employees" as an adverse action).

We similarly recognized in *Fielder v. UAL Corp.*, 218 F.3d 973, 985 (9th Cir. 2000) that "Title VII . . . [extends] to employer liability for co-worker retaliation," but that decision was vacated on other grounds in light of *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002).

statements" about her in retaliation for her federal discrimination lawsuit. *Id.* And like in *Knox,* Bishop argues that ATF is liable for "sitting on its hands in the face of [a] campaign of co-worker harassment." *Id.* at 1334-35.

The majority also dismisses Bishop's claim because, in its view, Bishop did not suffer consequences severe enough to be "materially" adverse. But the majority distorts the distinction between "material" and "trivial" harms under *Burlington*. Plainly, an employer's failure to rectify an offensive, widely spread email is not "trivial," meaning a "petty slight[] or minor annoyance[] that often take[s] place at work and that all employees experience." *Burlington*, 548 U.S. at 68. Devlin's email and its aftermath were not a typical occurrence in the workplace, such as an offhand joke between colleagues or a "simple lack of good manners." *Id.* Apart from such trivial, everyday matters, *Burlington* holds that any act can be material if it might deter victims of discrimination from coming forward. *See id.* at 68-69. In my view, ATF's inaction in the face of Bishop's colleagues' harassment would create such deterrence. I am not alone in my view, as demonstrated by the deposition testimony of Tehran Palmer, ATF's Division Chief for the Recruitment Diversity Hiring Division. When he was asked whether he thought that "ATF's failure to publicly respond to the [email]" or take other corrective action "might deter other people from coming forward and filing any EEO charge," he responded "yes."

8

Finally, even if there were merit to the majority's position, the majority errs by substituting its own judgment for that of a jury. We have explained that "in close cases . . . where the severity of . . . abuse is questionable, it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment." *Davis v. Team Elec. Co.,* 520 F.3d 1080, 1096 (9th Cir. 2008). That is because the question of materiality is highly context-dependent, and reasonable minds can disagree on the impact of an act of retaliation. *See Burlington*, 548 U.S. at 69. Whether ATF's behavior could well dissuade a reasonable employee from protected activity is a question that should be decided by a jury, not by this court. *See McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1112 (9th Cir. 2004) (expressing "the importance of zealously guarding an employee's right to a full trial" on employment discrimination claims, and warning against courts "too readily grant[ing] summary judgment" in this context).

**3.** The majority decision is wrong factually and legally. The majority fails to construe the evidence in the light most favorable to Bishop, invents a First Amendment issue where none exists, and improperly analyzes the standard for retaliation claims under *Burlington*. Because the evidence supporting Bishop's retaliation claim raised material factual disputes, the district court erred in granting summary judgment. We should reverse that ruling, and I dissent from our failure to do so.

9